UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WILBUR ROSS, *et al.*,<br><br>Defendants. | No. 1:20−CV−00431−DAD−SAB<br><br><u>ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER</u><br><br>(Doc. No. 131) |

**INTRODUCTION**

Plaintiffs, a coalition of six environmental organizations, bring this lawsuit against the National Marine Fisheries Service (NFMS), the U.S. Fish and Wildlife Service (FWS), the U.S. Bureau of Reclamation (Reclamation), and various official representatives of those agencies. (Doc. No. 52.) Plaintiffs' first and second claims for relief challenge the adoption by NMFS and FWS, respectively, of "biological opinions" prepared pursuant to the Endangered Species Act (ESA), 16 U.S.C § 1531 *et seq.*, regarding the impact of the long-term operation of the Central Valley Project (CVP) and the State Water Project (SWP) (collectively, "Water Projects") on various ESA–listed species. More specifically, plaintiffs' first and second claims for relief allege that NMFS and FWS violated the Administrative Procedure Act (APA), 5 U.S.C. § 706, in various ways by concluding that the Water Projects would not jeopardize the continued existence

1

of the ESA–listed species addressed in each biological opinion. Plaintiffs also bring claims against the Reclamation under the ESA (third claim for relief), and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* (fourth claim for relief).

On March 25, 2020, this case was transferred to this district from the U.S. District Court for the Northern District of California in light of related cases already pending before the undersigned. (Doc. No. 112.) In the interest of expedience, the court adopts the following factual summary recently articulated by the transferor judge:

> In two biological opinions (one issued in 2008 by the U.S. Fish and Wildlife Service and one issued in 2009 by the National Marine Fisheries Service), the Water Projects were authorized to kill, as incidental to their operations, a limited number of threatened and endangered species of fish. [Doc. No. 52 at 3–4 (¶ 6).] In 2016, after years of drought, the agencies reinitiated consultation under the Endangered Species Act. [*Id*. at 3–4 (¶ 1), 5 (¶ 10).] In January 2019, the Bureau of Reclamation issued a biological assessment for a new operating plan for the Water Projects. [*Id*. at 4 (¶ 7).] The plaintiffs claim that the assessment increased the pumping of water from the Sacramento Delta (for export to the Central Valley and Southern California) and weakened or eliminated operational requirements in the 2008 and 2009 opinions that protected listed fish populations. [*Id.*]
>
> In July 2019, biologists at the Fisheries Service prepared a biological opinion that concluded that "Reclamation's proposed plan was likely to jeopardize listed salmon and steelhead . . . and was likely to destroy or adversely modify critical habitat, in violation of the Endangered Species Act." [*Id*. at 5 (¶ 10).] Then, on October 21, 2019, the Fisheries Service issued a biological opinion that concluded — in contrast to the July 2019 opinion — that Reclamation's proposed plan was not likely to jeopardize the existence of winter-run and spring-run salmon and Central Valley steelhead beyond that permitted under its 2009 opinion. [*Id*. at 5–6 (¶ 12).] Similarly, Fish and Wildlife Service issued an opinion that Reclamation's proposed plan was not likely to jeopardize the continued existence of the Delta Smelt or modify its habitat. [*Id*. at 5 (¶ 11).] On February 18, 2020, Reclamation adopted its proposed plan and began implementing the altered operations of the Central Valley Project. [*Id*. at 6 (¶ 14).]

(Doc. No. 112 at 2–3.)

Plaintiffs initiated this lawsuit on December 2, 2019. (Doc. No. 1.) On April 3, 2020, while briefing on Plaintiffs' earlier filed motion for preliminary injunction (Doc. No. 85) was ongoing, plaintiffs became aware that Reclamation had begun to increase the volume of water exports at the CVP's pumping facilities in the Delta and planned to continue to do so for a

2

discrete period of time in early April 2020.  (*See* Doc. 132-5 (Second Declaration of Barbara Chisolm, Ex. E).)  It is plaintiffs' position—a position supported by the record in the undersigned's view—that this increased level of export pumping was contrary to the level of pumping all parties anticipated as indicated in earlier communications and representations to the court.  (*See id*.)  It is undisputed that this temporary increase in export pumping will necessarily come to an end on April 10, 2020, at least for the remainder month of April, when state-mandated constraints on Water Project exports come into effect.  (Doc. No. 137-1 (Second Declaration of Kristin White).)

Plaintiffs sought a temporary restraining order to enjoin the increased pumping on the ground that Reclamation's actions would harm the listed salmonid species at issue in this case: the winter-run and spring-run Chinook and the Central Valley steelhead.  (*See generally* Doc. 131.)  Specifically, plaintiffs seek an order imposing upon Reclamation certain operational restrictions set forth in NMFS's October 21, 2019 BiOp (2019 NMFS BiOp) and to continue those restrictions until the state-mandated constraints take effect on April 10.  (Doc. No. 131-1 (Proposed TRO Order).)  In part because the pending motion was filed on a Friday and in light of the complexity of the issues raised therein, the court permitted the Federal Defendants and Defendant Intervenors until 11:00 a.m. the following Monday, April 6, 2020, to file oppositions to plaintiffs' motion and set a telephonic hearing for April 7, 2020 at 11:00 a.m.  (Doc. No. 139.)[1]  All parties made appearances at that hearing through counsel as stated on the record.

Having considered the papers filed thus far and the parties' arguments presented at the hearing, and for the reasons explained below, the court declines to issue a TRO at this time.

## STANDARD OF DECISION

The standard governing the issuing of a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction.  *See Stuhlbarg Intern. Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th Cir. 2001).  "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the

---

[1] Plaintiffs filed a reply in support of their motion for a temporary restraining order shortly after 9:00 p.m. on April 6, 2020 (Doc. No. 140), which the court has considered.

3

merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'"); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 97 (9th Cir. 2008) (en banc)).[2] The party seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief"). Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

**DISCUSSION**

**A.      Likelihood of Success on the Merits**

Because time is of the essence, the court will dispense with a standard recitation of the general substantive and procedural requirements of the ESA as well as the general standard of decision applicable to claims brought under the APA. Instead the court turns to the heart of the matter now at issue. The essence of plaintiffs' concern here is that Reclamation's actions in early

---

[2] The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test." *All. for the Wild Rockies*, 632 F.3d at 1134. "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. at 1135.

4

April are not sufficiently protective of the winter-run and spring-run Chinook, and/or the Central Valley steelhead—juveniles of all of which are currently present in the Delta. Plaintiffs point out that the 2019 NMFS BiOp, which currently governs Water Project operations, omits a particular protective measure required by the previous NMFS BiOp issued in 2009 (2009 NMFS BiOp). Specifically, the 2009 NMFS BiOp imposed limits on exports by way of a requirement that San Joaquin River inflow be balanced against exports according to pre-determined ratios (I:E Ratio) set according to the category of water year (critically dry, dry, above normal, wet). (Doc. No. 85-18 (2009 NMFS BiOp at 644-645.)) For a critically dry year, the 2009 NMFS BiOp imposed a ratio of San Joaquin River inflow to combined exports of 1:1, while in a dry year, the ratio was 2:1. (*Id*.) The Ninth Circuit reviewed one specific aspect of this I:E Ratio—the imposition of a 4:1 ratio in wet years—in *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1004 (9th Cir. 2014), and found this "conservative threshold" to be "traceable to the record" and therefore within NMFS's discretion to implement.

The 2019 NMFS BiOp eliminated this requirement, leaving no San Joaquin inflow:export ratio in place for the early April timeframe, instead imposing an arguably complex suite of alternative protective measures built into Reclamation's proposed Water Project (sometimes referred to as "Coordinated Long Term Operations" (LTO)). The reasoning of the 2019 NMFS BiOp appears to lean heavily on "performance measures" described succinctly by one of the expert declarations presented to the court as follows:

> The LTO includes a performance measure that specifically limits the losses in any single year to 90% of the greatest annual loss recorded since the implementation of the 2009 BiOp (2010 to 2018). If in any year, 50% and 75% of the annual loss thresholds are exceeded, CVP and SWP exports will be managed to [Old and Middle River (OMR) reverse flow] targets of -3,500 [cubic feet per second (cfs)] and -2,500 cfs, respectively.

(Doc. No. 130-1 (Declaration of Chandra Chilmakuri) ¶ 32.)

The court believes that the record supports, at least preliminarily, a finding by this court that NMFS's decision to not impose an I:E ratio during early April amounts to a change of position that triggers certain obligations under the APA. Specifically, where an agency departs from its previous findings, the bedrock principle that an agency "must examine the relevant data

5

and articulate a . . . rational connection between the facts found and the choice made," means that the agency must examine its own "prior factual findings [and] conclusions," and "'articulate a satisfactory explanation' when it changes its mind." *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1262 (9th Cir. 2017) (quoting *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010)). Here, plaintiffs have raised serious questions about whether NMFS has articulated a satisfactory explanation for its dramatically changed approach.[3] NMFS's July 2019 draft biological opinion (the one that was shortly thereafter abandoned) concluded that the loss-threshold approach was "considerably less protective" for San Joaquin River basin steelhead. (Doc. No. 140-3 at 405.) Even the final 2019 NMFS BiOp reiterates in various places that the proposed regulatory regime (including the absence of the 2009 NMFS BiOp's I:E ratio) will be detrimental to fish populations. For example, in discussing the results of at least one flow modeling exercise, NMFS acknowledged that the proposed regulatory regime would result in flows that are "more negative" than under the 2009 NMFS BiOp which in turn will "be more negative to fish." (Doc. No. 85-1 (2019 NMFS BiOp) at 483.)

All defendants maintain here that the 2019 NMFS BiOp is a complex document that incorporates numerous provisions designed to be protective of species, including the "performance objectives" described above. Although NMFS leans heavily on the "delta performance objectives" described above, it does not appear to be prepared to conclude those measures are sufficient to make up for lost ground. Particularly with respect to impacts to San Joaquin Basin Central Valley steelhead, NMFS has stated:

> Reclamation's proposed action could create conditions that would reduce steelhead survival to Chipps Island for the Southern Sierra Nevada Diversity Group, further exacerbating the already diminished status of this diversity group.

---

[3] At oral argument, counsel for Defendant Intervenors San Luis & Delta Mendota Water Authority and Westlands Water District suggested, at least indirectly, that this might not be the appropriate standard to apply because, here, NMFS has not technically changed its position. Rather, they suggest, only the Water Project proposed by Reclamation has changed. The court sees this as a distinction without a difference. Either way, NMFS's obligations under the APA would require it to explain why a protective measure it previously thought was crucial enough to impose upon operations is no longer necessary either as part of the project itself or as a condition of its implementation.

6

> During the consultation process, NMFS and Reclamation worked to develop actions that might *partially offset* the effects to San Joaquin basin steelhead related to not having [an] I:E ratio or Head of Old River Barrier in plan. Delta Performance Objectives including a Cumulative Loss Threshold and a Single-year Loss Threshold with two time periods (December through March and April through June) that are intended to provide protections for both San Joaquin basin and Sacramento basin CCV steelhead. Reclamation also proposed the CCV steelhead Lifecycle Monitoring Program, in part to help improve CCV steelhead science to can be used to protect San Joaquin Basin steelhead and inform actions such as water operations.

(2019 NMFS BiOp at 777) (emphasis added). At oral argument, Federal Defendants directed the court's attention to a lengthy section of the 2019 NMFS BiOp that attempts to integrate and synthesize all of the impacts of all of the various changes (positive and negative) proposed by the LTO relative to the 2009 NMFS BiOp. (*Id*. at 747–96.) Among other things, the 2019 BiOp imposes various conservation measures and limits on negative flows in the Old and Middle River channels of the San Joaquin River. To the extent the court has been able to review that section of the 2019 NMFS BiOp in the limited time available thus far, it does appear that NMFS at least facially concluded that overall operations, including the performance measures, will not jeopardize the species. Unfortunately perhaps, it is simply impossible for the court to examine the rationale underpinning these complex conclusions on such a short timeframe thoroughly enough to determine whether plaintiffs are likely to be able to show that NMFS has violated the APA. Accordingly, the court cannot find at this time that plaintiffs are likely to succeed on the merits. Nonetheless, as discussed above, the court does conclude that plaintiffs have certainly raised serious questions as to whether NMFS has justified its changed position and ultimate conclusion.

**B.   Irreparable Harm/Balance of the Harms**

In light of the above, the analysis proceeds under the Ninth Circuit's alternative injunction standard, that permits injunctive relief "when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Cottrell*, 632 F.3d 1134–35. In applying this standard, the undersigned remains mindful that an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the

plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Of course, to show irreparable harm, plaintiffs do not need to demonstrate an "extinction level" threat. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818–19 (9th Cir. 2018) (permitting without specifying that some "lesser magnitude" of harm will suffice); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir. 2008) (finding an agency "may not take action that deepens [pre-existing/baseline] jeopardy by causing additional harm"). Thus, for example, impeding a listed species' progress toward recovery may suffice to satisfy the irreparable harm requirement. *Wishtoyo Found. v. United Water Conservation Dist.*, No. CV 16-3869-DOC (PLAx), 2018 WL 6265099, at *65 (C.D. Cal. Sept. 23, 2018), aff'd, 795 F. App'x 541 (9th Cir. 2020).

However, here plaintiffs appear to be advocating application of an irreparable harm analysis that is largely untethered from any sense of the magnitude of that impact to the overall population of that species. They cite the decision in *Yurok Tribe v. United States Bureau of Reclamation*, 231 F. Supp. 3d 450, 481 (N.D. Cal. 2017), in which the district court stated that a plaintiff attempting to obtain an injunction in an ESA case need not show harm to the "species as a whole" and that harm" of any magnitude" is sufficient to warrant injunctive relief. Nonetheless, while the court in *Yurok* correctly did not require proof that the species in question would be extirpated to justify its issuance of the injunction, it did find population-level harms. *Id*. at 483–84. In this regard, in granting the injunction in that case the court found that the "rate" of a certain infection threatening a population of Coho salmon would "further diminish the salmon's resilience, abundance, and health," and that protective flows were required to avoid high rates of infection "that will weaken an already weakened population." *Id*. at 483–84.

Another decision out of the Northern District of California collected a number of cases addressing this subject and observed:

> The plaintiff may be simply assuming that the death of any listed animal, or any of its eggs, constitutes irreparable harm for purposes of issuing a preliminary injunction. However, the law does not go quite so far. No court has held that as a matter of law, the taking of a single animal or egg, no matter the circumstance, constitutes irreparable harm. *See Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 109 (D. Me .2008); *Alabama v. U.S. Army Corps of*

8

*Engineers*, 441 F. Supp. 2d 1123, 1135–36 (N.D. Al. 2006) (collecting opinions); *Defenders of Wildlife [v. Salazar]*, 2009 U.S. Dist. LEXIS 131058 at *14 [(D. Mont., Sept. 8, 2009)] ("[T]o consider any taking of a listed species as irreparable harm would produce an irrational result" because the ESA allows for incidental take permits.) The court in *Pacific Coast Federation of Fisherman's Association v. Gutierrez*, 606 F.Supp.2d 1195 (E.D. Ca. 2008) (Wanger, J.), considered the types of harms that a plaintiff must show to demonstrate a reasonable likelihood of irreparable harm in the Ninth Circuit. The *Gutierrez* court noted that the standard does not require a showing of likely "extirpation" of the species, id. at 1207, but rather considers whether the action sought to be enjoined "will reduce appreciably [the species'] likelihood of survival or recovery or appreciably diminish the value of their critical habitat." *Id*. (citing *National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917, 931 (9th Cir. 2007)). The court accepted the FWS' definition of "appreciably diminish" to mean "considerably reduce." *Id*. at 1208 (citing USFWS/NMFS, ESA Section 7 Consultation Handbook (March 1998), at 4–34).

*Wild Equity Inst. v. City & Cty. of San Francisco*, No. C 11-00958 SI, 2011 WL 5975029, at *7 (N.D. Cal. Nov. 29, 2011). While the undersigned is not necessarily adopting this reasoning in its entirety at this time, the alternative preliminary injunction standard applicable under these circumstances necessarily acts so as to require a somewhat enhanced showing of irreparable harm by plaintiffs. *See Cottrell*, 632 F.3d at 1134–3 (requiring moving party to show that the "balance of hardships tips sharply in the plaintiff's favor").

Here, it is quite clear, and no party disputes, that a not-insignificant percentage of each of the species of concern are presently in the Delta.

> The interagency Salmon Monitoring Team reviewed data on April 1, 2020 and observed the majority of winter-run Chinook salmon (55%) had exited the Delta this week with the remainder (39-43%) in the Delta (Plaintiffs assert that 53-58% is currently in the Delta, but this information can change every day as new data is processed). For spring-run Chinook salmon, they observed more fish entering the Delta (53-68%) compared to last week, with 30-45% having yet to enter the Delta. They noted winter-run and spring-run Chinook salmon were shifting from a rearing behavior to a migration behavior, were observed in salvage, and based on observed and historical trends were likely to increase in salvage. Also, the interagency Salmon Monitoring Team reviewed steelhead monitoring data and found the majority of the population remains outside the Delta. They estimated 40-65% of steelhead had yet to enter the Delta, 30-50% were in the Delta, and 5-10% were out of the Delta.

(Doc. 137-4 (Declaration of Joshua Israel) ¶ 17 (internal citations omitted).) It is also undisputed that "salvage" and "loss" is occurring[4] at (or as a result of) the export pumping facilities, and that this salvage is increasing as pumping rates have increased over recent days. (Doc. 137-3 (Declaration of Howard Brown) at ¶ 14.) But, as one NMFS declarant has noted: "this is not unusual," and "the fact that entrainment occurs or is occurring is not the decisive factor" in operational decision making. *Id*. Section 7 of the ESA contemplates that a project such as the one under consideration here may cause "incidental take" of listed species without necessarily resulting in jeopardy, 16 U.S.C. § 1536(b)(4), and every biological opinion issued in connection with the projects in recent history has anticipated and permitted some degree of entrainment/salvage and loss at or due to pumping operations.

At the same time, no party disputes plaintiffs' general assertion that the species at issue here are at a significant risk of extinction. (*See* Doc. No. 82 (Declaration of Jonathan Rosenfeld) ¶ 7.) Notably, one of the central reasons for the re-consultation that triggered the issuance of the 2019 NMFS BiOp was "extremely low population levels" of the winter run. (2019 NMFS BiOp at 11.) Plaintiffs point out that in defending its prior biological opinion, an NMFS scientist took the position that "[t]he incidental take limit for salvage should not be viewed as a quota to operate to by the Projects, but more rationally as an upper limit of direct take that should never be reached due to the implementation of the RPA actions." (Doc. 140-4 (March 15, 2020 Declaration of Jeffrey Stuart), ¶ 47; *see also* Doc. 85-21 (NMFS's January 5, 2017 Frequently Asked Questions (emphasizing that "Impacts to fish seen at the pumps are just the 'tip of the iceberg,'" and that pumping operations cause harm to fish that are not entrained into the export facilities)).)

---

[4] Various terms are used throughout the record to describe impacts on fish of export pumping. As one declarant has explained, the term "entrainment" means "fish entering the [CVP's] Tracy and [SWP's] Skinner fish facilities by virtue of the water diversions at the Jones and Banks Pumping Plants, respectively. The Tracy Fish Collection Facility intercepts fish from the Old River [stem of the San Joaquin River] 2.41 miles upstream from the CVP Jones Pumping Plant. The John E. Skinner Delta Fish Protective Facility is located upstream of the SWP Banks Pumping Plant and uses louvers to divert fish from being entrained into the pumping plant and California Aqueduct." (Chilmakuri Decl. at ¶ 6.) "Salvage" is the number of entrained fish accounted for during the monitoring at the Tracy and Skinner fish facilities and expanded to account for sampling frequency. (*Id*.) "Loss" is an estimate of direct and indirect mortality as a result of the entrainment, and that loss is estimated based on the salvage. (*Id*.)

1          Yet, these statements, which directly counsel against using the incidental take limits set
2   forth in the 2019 BiOp as operational markers, do not as directly undermine the performance
3   measures used in the present biological opinion. Those performance measures now set as an
4   upper threshold, loss of 90% of the highest loss from 2010-2018 (years in which losses at the
5   pumps were relatively low). The present approach requires ramping down of pumping when
6   losses get to 50% of that number, and further ramping down when losses reach 75% of that
7   number. Defendants and defendant intervenors' declarants all conclude that these performance
8   measures are sufficiently protective of the species, in part because they trigger action in the form
9   of reduced pumping <u>well before</u> take limits are reached. (*See generally* Israel Decl. and
10  Chilmakuri Decl.) They also point out, and the record confirms, that levels of loss at the export
11  facilities over the past several days, while increasing, are still cumulatively low relative to the
12  performance measures. (*See* Brown Decl., ¶ 14.)
13         The court acknowledges that there is debate in the record about this. (*See* Rosenfeld Decl.
14  ¶¶ 118-27.) In addition, as discussed above, there are serious questions raised about whether
15  these performance measures, which are indisputably tethered to loss at the export facilities, fail to
16  sufficiently capture for management purposes the broader impacts of exports on juvenile fish
17  migrating through the delta. Declarants also point out that there is some evidence to suggest that
18  salmonid survival—particularly San Joaquin River steelhead—would be increased by re-
19  imposing an I:E ratio. (*Id.* ¶ 122.) Nonetheless, in light of the conflicting evidence and
20  information, the low levels of loss relative to the parameters set forth in the 2019 NMFS BiOp,
21  and the absence of any clear showing that those parameters are insufficiently protective, the court
22  simply finds that on the present record, plaintiffs have not sufficiently established the likelihood
23  of irreparable harm in the absence of the requested temporary restraining order or justified that
24  the impacts of the anticipated export levels between now and April 10, 2020 warrant the
25  "extraordinary remedy" of an injunction at this time.
26  /////
27  /////
28  /////

**CONCLUSION AND ORDER**

For the reasons set forth above, the application for a temporary restraining order (Doc. No. 131) is DENIED.

IT IS SO ORDERED.

Dated:  **April 7, 2020**

                                         /s/ Dale A. Drozd
                                         UNITED STATES DISTRICT JUDGE