UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, *et al.*,<br><br>                   Plaintiffs,<br><br>         v.<br><br>WILBUR ROSS, *et al.*,<br><br>                 Defendants. | No. 1:20-CV-00431-DAD-EPG<br><br>ORDER REQUIRING SUBMISSION OF SUPPLEMENTAL INFORMATION ON REMAINING PRELIMINARY INJUNCTION ISSUES<br><br>(Doc. No. 81) |

**INTRODUCTION**

Plaintiffs in the above-captioned action, *Pacific Coast Federation of Fishermen's Associations v. Ross*, 1:20-CV-00431-DAD-EPG (*PCFFA*), are a coalition of six environmental organizations led by PCFFA (collectively, "PCFFA"). A closely related case, *California Natural Resources Agency v. Ross*, No. 1:20-CV-00426-DAD-EPG (*CNRA*), is also pending before the undersigned. In *CNRA*, plaintiffs are the People of the State of California, California's Natural Resources Agency, and California's Environmental Protection Agency (collectively, "California").

Both sets of plaintiffs bring claims against the National Marine Fisheries Service (NMFS), the U.S. Fish and Wildlife Service (FWS), the U.S. Bureau of Reclamation (Reclamation), and

1   various official representatives of those agencies.  (*CNRA*, Doc. No. 51, First Amended

2   Complaint (FAC); *PCFFA*, Doc. No. 52, FAC.)  Plaintiffs in both cases challenge the adoption by

3   NMFS and FWS, respectively, of a pair of "biological opinions" (BiOps) issued in 2019 pursuant

4   to the Endangered Species Act (ESA), 16 U.S.C § 1531 *et seq.*, regarding the impact on various

5   ESA-listed species of implementing Reclamation's updated plan for the long-term operation of

6   the Central Valley Project (CVP) and the State Water Project (SWP) (collectively, "Water

7   Projects" or "Proposed Action").  FWS's 2019 BiOp (2019 FWS BiOp) addressed the impacts of

8   the Proposed Action on Delta smelt, while NMFS's 2019 BiOp (2019 NMFS BiOp) addressed

9   the impacts of the updated plan to, among others, three species of salmonids:  winter-run Chinook

10   salmon (winter-run) and spring-run Chinook salmon (spring-run), and California Central Valley

11   steelhead (CCV steelhead).  All plaintiffs allege that NMFS and FWS violated the Administrative

12   Procedure Act (APA), 5 U.S.C. § 706, in various ways by concluding that the Water Projects

13   would not jeopardize the continued existence of the ESA-listed species addressed in each

14   biological opinion.  Both sets of plaintiffs also bring claims against Reclamation under the ESA

15   for unlawfully relying on the 2019 BiOps in formally adopting and implementing the Proposed

16   Action, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*[1]

17       In an order issued May 11, 2020, the court resolved certain aspects of overlapping

18   requests for preliminary injunctive relief filed by PCFFA and California, namely issues related to

19   species impacts caused by the Water Projects' export pumping operations in the southern portion

20   of the Sacramento-San Joaquin Delta (Delta) as well as potential impacts related to the operation

21   of New Melones Dam on the Stanislaus River.  (*CNRA*, Doc. No. 106; *PCFFA*, Doc. No. 173

22   (Delta/Stanislaus PI Order).)  However, in part in order to expedite the issuance of its May 11,

23   2020 ruling, the court held in abeyance certain issues raised in PCFFA's motion for preliminary

24   injunction (*PCFFA* PI Motion) concerning instream temperature management measures aimed at

25   protecting winter-run and spring-run eggs and juveniles in the reaches of the Upper Sacramento

---

[1]  California's complaint in *CNRA* also alleges that Reclamation has violated the APA by failing to comply with measures California put in place under the California Endangered Species Act (CESA) to protect Longfin smelt, compliance with which California alleges is required by various provisions of federal law.

1   River below Shasta and Keswick Dams.  Here, the court will not delve into all of the details of the

2   Upper Sacramento River temperature management scheme but, rather, reviews only the

3   background and preliminary analysis necessary to:  (1) explain why it will hold this remaining

4   issue in abeyance for an additional, brief period of time; and (2) articulate the additional

5   information it requires in order to complete its evaluation of PCFFA's motion for a preliminary

6   injunction.

7   **FACTUAL BACKGROUND**

8   **A.      Winter-Run, Spring-Run and Shasta Dam**

9          Winter-run are listed as endangered under the ESA.  (*PCFFA*, Doc. No. 85-2 (2019

10  NMFS BiOp) at 65.)  Before construction of Shasta Dam, the winter-run had access to the

11  Sacramento River upstream of Shasta Dam's present location and the upper tributaries where

12  springs provided cold water throughout the summer.  (*Id.* at 69–70.)  Shasta Dam and Keswick

13  Dam (a smaller, regulating dam that sits nine miles downstream of Shasta) block access to this

14  extensive former spawning habitat.  (*Id*. at 70.)  As a result, the only population of winter-run

15  spawns exclusively in the reaches of the Upper Sacramento River below Keswick Dam and this

16  "single population . . . has been supported by cold water management operations at Shasta Dam."

17  (*Id*.)  Generally, winter-run adults migrate upstream through the San Francisco Bay-Delta region

18  during the winter and spring months and spawn in the upper Sacramento river in the summer

19  months.  (*Id*. at 70–71.)[2]  The ocean stage of the winter run life cycle typically lasts three years.

20  (*PCFFA*, Doc. No. 85-18 (2009 NMFS BiOp) at 87.)

21          Spring-run are listed as threatened under the ESA.  (2019 NMFS BiOp at 79.)  They are

22  somewhat more geographically widespread than winter-run, with populations at varying levels of

23  viability known to spawn on several tributaries to the Sacramento River.  (*Id*. at 89.)  The ocean

24  stage of the spring-run life cycle typically lasts one to five years.  (*Id*. at 88.)  Spring-run adults

25  _____

26  [2]  According to the 2019 NMFS BiOp:  "Sacramento River winter-run Chinook salmon are
    particularly important among California's salmon runs because they exhibit a life-history strategy
    found nowhere else in the world.  These Chinook salmon are unique because they spawn during
27  the summer months when air temperatures usually approach their warmest.  As a result, winter-
    run Chinook salmon require stream reaches with cold-water sources to protect their incubating
28  eggs from the warm ambient conditions."  (*Id*. at 65.)

typically migrate upstream, unsurprisingly, in the spring, from January to June. (*Id*. at 89.) In at least one location (Clear Creek), adult spring-run "hold" for several months in the mid-late summer before spawning in September and October. (*Id*. at 85.) Some spawning also occurs in the mainstem Sacramento River (*id*. at 89), although the numbers of fish spawning there have generally been limited in recent years. (*Id*. at 91.) Juvenile spring-run exhibit varied rearing behavior and outmigration timing. Some juveniles may reside in upstream areas for 12–16 months (these individuals are characterized as "yearlings"), while some may migrate to the ocean shortly after hatching as "young-of-the-year." (*Id*. at 85.)

Shasta Dam is equipped with a temperature control device (TCD) that allows Reclamation to control the temperature of water released from the Dam. (*PCFFA,* Doc. No. 85-12 (2019 Biological Assessment (BA)) at 4-26.) "The TCD has four levels of gates from which water can be drawn." (*Id*.) During mid-winter and early spring, Reclamation uses the highest possible elevation gates to draw from the upper levels of the lake and conserve the deeper, colder water. (*Id*. at 4-27.) During late spring and summer, as Shasta Reservoir elevation decreases, Reclamation progresses to open deeper gates to release the colder water. (*Id*.)

Generally, temperature management below Shasta/Keswick involves the release of cold water to meet target temperatures at various temperature compliance points (TCP) along the Sacramento River. Keswick Dam is located at River Mile 302. (2019 BA at 2-13.[3]) The furthest upstream TCP is Clear Creek (about 10 river miles below Keswick), then Airport Road Bridge (15 river miles below Keswick), Balls Ferry (25 river miles below Keswick), and Bend Bridge (44 river miles below Keswick). (*Id*.) The general purpose of these temperature compliance points is to keep water temperatures cool enough to avoid damaging salmon eggs, a phenomenon known as "temperature-dependent mortality." (*See* BA 4-29; *PCFFA*, Doc. No. 82, Declaration of Dr. Jonathan Rosenfield (Rosenfeld Decl.) at ¶ 138.)

/////

---

[3] While the parties have submitted excerpts from the 2019 BA, the court here references pages from the complete document, which is available at: https://www.usbr.gov/mp/bdo/docs/ba-final-biological-assessment.pdf (last visited May 15, 2020).

**B.      2009 NMFS BiOp & RPA**

On June 4, 2009, NMFS issued, and Reclamation accepted, a BiOp that concluded that "the long-term operations of the CVP and SWP are likely to jeopardize the continued existence" of various listed species, including winter-run and spring-run, and "destroy or adversely modify" those species' critical habitats. (2009 NMFS BiOp at 575.) Specifically, as relevant to this order, the 2009 NMFS BiOp explained that:

> Water operations result in elevated water temperatures that have lethal and sub-lethal effects on egg incubation and juvenile rearing in the upper Sacramento River. The immediate operational cause is lack of sufficient cold water in storage to allow for cold water releases to reduce downstream temperatures at critical times and meet other project demands. This elevated temperature effect is particularly pronounced in the Upper Sacramento for winter-run and mainstem spring-run, and in the American River for steelhead. The RPA includes a new year-round storage and temperature management program for Shasta Reservoir and the Upper Sacramento River, as well as long-term passage prescriptions at Shasta Dam and re-introduction of winter-run into its native habitat in the McCloud and/or Upper Sacramento rivers.

(*Id*. at 576–77.)

As required under the ESA, *see* 16 U.S.C. §§ 1536(a)(2), (b)(3)(A), the BiOp included a "Reasonable and Prudent Alternative" (2009 RPA) designed to allow the projects to continue operating without causing jeopardy to the species or adverse modification to its critical habitat. (*Id*. at 575–671). Most relevant here, for the summer, the 2009 RPA required Reclamation to develop a temperature management plan and implement Shasta Dam operations to achieve daily average water temperatures not in excess of 56° between Balls Ferry and Bend Bridge from May 15 through September 30 for the protection of winter-run, and not in excess of 56° between Balls Ferry and Bend Bridge from October 1 through October 31 for the protection of spring-run in the mainstem Sacramento River "whenever possible." (*Id*. at 601.) The 2009 RPA acknowledged that "extending the range of suitable habitat by moving the compliance point downstream from Balls Ferry" must be balanced against the need to conserve storage in order to accumulate a sufficient cold water pool for use during the subsequent temperature management season. (*Id*. at

/////

/////

5

602.)  The 2009 RPA also provided drought exception procedures and contingency plans if these temperatures could not be achieved.  (*Id*. at 600.)[4]

**C.       Loss of Temperature Control in 2014 & 2015; Reinitiation of Consultation**

In 2014 California was in the third year of a drought.  (2019 NMFS BiOp at 69.) According to PCFFA's expert, Dr. Rosenfield, early in 2014, Reclamation moved the temperature compliance point "far upstream above Clear Creek's confluence with the Sacramento River," predicting it could provide required water temperatures to that point.  (Rosenfeld Decl. at ¶ 171.) However, despite initial modeling that indicated compliance was possible and despite Reclamation obtaining various waivers from state Delta outflow requirements Reclamation asserted were necessary to maintain appropriate water temperatures, river temperatures at the revised temperature control point nonetheless exceeded 56°F.  (*Id.*)  This resulted in temperature dependent egg mortality in 2014 of 77 percent (*id*.) and extremely poor egg-to-fry survival (measured as the percentage of eggs that survived to produce fry capable of passing Red Bluff Diversion Dam on the lower Sacramento River) of approximately four percent.  (2019 NMFS BiOp at 69) (citations omitted).

The story was much the same in 2015.  (*See* Rosenfeld Decl. at ¶ 172.)  Indeed, egg-to-fry survival that year was the lowest on record (approximately three percent), "due to the inability to release cold water from Shasta Dam in the fourth year of the drought."  (*Id*.)  As a result, and as the 2019 NMFS BiOp explains, "[w]inter-run [] returns in 2016 to 2018 were low, as expected, due at least in part to poor in-river conditions for juveniles from brood year 2013 to 2015 during drought years."  (*Id*.)  Although "[t]he 2018 adult winter-run return (2,639) improved from 2017 (977)," it was "dominated by hatchery-origin fish."  (*Id*.)

NMFS acknowledged the precarious situation of the winter run in a 2016 request for re-initiation of the inter-agency consultation process required by the ESA, *see* 16 U.S.C. § 1536, stating:  "recent data demonstrate []extremely low abundance levels for endangered Sacramento

---

[4] The 2009 Shasta Dam RPA also created long-term performance measures related to Reclamation's success at maintaining appropriate temperature control and the volume of stored water carried over through the winter into the subsequent season.  (*Id*. at 592.)

6

1   River winter-run. . . ." (*PCFFA*, Doc. No. 85-5 at 2.)  NMFS also drafted an amendment to the

2   2009 RPA actions related to Upper Sacramento temperature management.  (*PCFFA*, Doc. No. 85-

3   8.)  That draft RPA amendment called for Reclamation to operate Shasta Dam to ensure

4   temperatures did not exceed 56.0°F daily average temperature at a compliance location between

5   Balls Ferry and Bend Bridge from the start of winter-run spawning, based on aerial redd[5] or

6   carcass[6] surveys, through 100 percent winter-run "emergence" (i.e., when the eggs hatch).  (*Id.* at

7   18.)  The draft also called for the maintenance of 56.0°F daily average temperatures at the same

8   compliance location through October 31 for protection of mainstem spring run "whenever

9   possible." (*Id.*)  Among other things, the draft also proposed to place strict limits on temperature

10  dependent mortality below Shasta Dam.  (*Id.* at 14 (proposing that temperature dependent

11  mortality should not exceed 30% in critically dry years, 8% in dry years, and 3% in below

12  normal, above normal, and wet years).)  Reclamation responded to that proposal by indicating

13  that additional work would be needed to ensure that the objectives identified by NMFS were

14  "feasible, scientifically sound, and address[ed] impacts to the other requirements and beneficial

15  uses of the CVP and SWP." (*PCFFA*, Doc. No. 85-9 at 2.)

16        The 2019 NMFS BiOp describes how temperature management was actually implemented

17  from 2016 through the issuance of the 2019 BiOp as follows:

18            On August 2, 2016, Reclamation requested using the adaptive
              management provision in the NMFS 2009 Opinion related to Shasta
19            Reservoir operations.  The basis for this request included recent,
              multiple years of drought conditions, new science and modeling, and
20            data demonstrating the low population levels of endangered winter-
              run Chinook salmon and threatened CV spring-run Chinook salmon.
21            In response, Reclamation implemented a 2017 pilot approach that
              applied new science on the thermal tolerance of Chinook salmon
22            eggs (Martin et al. 2016) and which was designed to efficiently
              utilize Shasta Reservoir's limited supply of cold water by basing the
23            spatial distribution of protective temperatures on the within-season
              spatial distribution of winter-run Chinook salmon redds.  The intent
24            was to provide daily average water temperatures of 53°F or less to
              the Clear Creek gauging station as a surrogate for the furthest
25            downstream redds.  The 2009 RPA requirement was a daily average

26  _____

27  [5]  Salmon eggs incubate for weeks to months in gravel nests, known as redds.  (Rosenfeld Decl. at
    ¶ 136.)

28  [6]  Chinook salmon die after spawning.  (Rosenfeld Decl. at ¶ 136.)

> temperature of 56°F or less at compliance locations between Balls Ferry and Bend Bridge, which are not based on the within-season redd distribution. [T]he 2017 pilot approach, along with one of the wettest years on record (in water year 2017), resulted in an estimated 44 percent egg-to-fry survival, one of the highest estimates on record. The pilot approach was implemented in 2018 and . . . 2019. In July 2019, CDFW aerial redd surveys indicated redd distribution was further downstream than the targeted temperature management location at CCR. Per the request of the fish agencies, and as a result of Reclamation's temperature modeling that indicated the operation was feasible, on August 7, 2019, Reclamation initiated temperature management to target 53.5°F at the Airport Road location.

(2019 NMFS BiOp at 173.)

**D.      The 2019 NMFS BiOp**

Further consultation between NMFS and Reclamation, including at one point the issuance of a draft "jeopardy" opinion by NMFS (*PCFFA*, Doc. No. 85-13), resulted in revisions to the final Proposed Action and ultimately to the issuance by NMFS of a "no jeopardy" biological opinion. (*See generally* 2019 NMFS BiOp.) The final Proposed Action implements a tiered Shasta temperature management strategy designed, at least facially, to account for the real-time spatial and temporal distribution of redds to attempt to conserve cold water for use when it is most needed. The operation manager of Reclamation's Central Valley Office, Kristin White, describes this tiered approach generally as follows.

> The tiered strategy recognizes that cold water is a scarce resource and that additional measures may be required when hydrology and meteorology do not provide sufficient cold water to avoid temperature dependent mortality throughout the entire temperature management period. The tiered strategy is intended to optimize use of cold water at Shasta for Winter-Run Chinook Salmon eggs based on life-stage-specific requirements during the temperature management season.

(*PCFFA*, Doc. No. 119-1, Declaration of Kristin White at ¶ 23 (citing BA at 4-31 to 4-32).)

NMFS concluded that the Clear Creek TCP serves as a reliable surrogate for controlling temperatures at the farthest downstream redd location. (*See* 2019 NMFS BiOp at 173, 237.) Although historically spawning was expected to begin in April, in recent years, the onset of spawning has been later—into May and June. (2019 NMFS BiOp at 243–4.) The tiered strategy adopts the view that using cold water too early (i.e., before redds are deposited) and/or to meet a

TCP too far downstream of the actual location of redds, "wastes" cold water that is needed later

in the season during the critical incubation season.  Thus, the tiered strategy "allows for

strategically selected temperature objectives," based on projected total storage, the available "cold

water pool," meteorology, and downstream conditions (which can influence how much water

Reclamation must release for other reasons), among other things.  (2019 BA at 4-28.)

The temperature targets for each "Tier" are as follows:

- In Tier 1 years, Reclamation will operate to maintain daily average temperatures of 53.5°F at Clear Creek throughout the entire temperature management season (May 15 through Oct 30).  (2019 NMFS BiOp at 241–2.)

- In Tier 2, Reclamation will target 53.5°F during the "critical egg incubation period." (*Id*. at 242.)

- Tier 3 is the proposed operation when the cold water pool in Shasta Reservoir on May 1 is less than 2.3 million acre-feet <u>or</u> when modeling suggests that maintaining 53.5°F at the Clear Creek TCP would have higher mortality than a warmer temperature.  (*Id*.) In a Tier 3 years, Reclamation would target 53.5°–56° degrees during the critical egg incubation period and would consider "intervention measures."[7]  (*Id*.)  Reclamation would not allow temperatures to exceed 56° but would decrease temperatures to below that during the periods of greatest temperature stress on the species.  (*Id*.)

- Tier 4 conditions are "defined by mid-March storage and operations forecasts of Shasta Reservoir total storage less than 2.5 million acre-feet at the beginning of May, or if Reclamation cannot meet 56°F at Clear Creek gauge."  (*Id*. at 243.)  In this scenario, "Reclamation proposes to initiate discussions with FWS and NMFS on potential intervention measures to address low storage conditions that continue into April and May."  (*Id*. at 243.)

/////

---

[7]  "Intervention measures" would include "consulting with []FWS and NMFS, increasing hatchery intake, adult rescue, and juvenile trap and haul."  (*Id*. at 249.)  NMFS notes in the 2019 NMFS BiOp that "any benefits from implementation of these measures is not included in results presented [therein] due to their inability to be characterized by the modeling."  (*Id*. at 243.)

There is no dispute between the parties that this year, circumstances place the Water Projects into Tier 3.  (Tr. 101.)

NMFS reviewed the tiered management strategy in some detail in the 2019 NMFS BiOp and summarized its own evaluation of the impacts that it anticipated would result from operations under each of these Tiers.

- In Tier 1 years, NMFS expects an average modeled temperature dependent egg survival of 94–95 percent.  (*Id*. at 241–2.)  Reclamation is expected to operate under Tier 1 in 68 percent of years.  (*Id*.)

- In Tier 2 years, average modeled temperature dependent egg survival is anticipated to be 85–88, which is expected to occur in 17 percent of years.  (*Id*. at 750.)

- Modeling suggests Tier 3 would be in place for 7–15 percent of years.  (*Id*. at 243, 248.)  The 2019 NMFS BiOp indicates that temperature conditions in a Tier 3 year would result in an estimated temperature-dependent mortality of between 28 percent and 34 percent according to the two dominant modeling approaches, respectively. (*Id*.)

- NMFS expects Tier 4 conditions to exist in five to seven percent of years.  (*Id*. at 252.)  Modeling indicates that during Tier 4 years, 53.5°F is exceeded on 86 percent of days that fall within the temperature management period.  (*Id*.)  "This exposure corresponds to an estimated temperature-dependent mortality in Tier 4 years of between 79 percent and 81 percent."  (*Id*.)

Reclamation's Proposed Action, as analyzed in the 2019 NMFS BiOp, plans for certain other measures designed with an intent to benefit winter-run.  Within 18 months of adoption of the Proposed Action, Reclamation will develop a "voluntary toolkit to be exercised at the discretion of Reclamation, DWR, other agencies, participating water users, and/or others for the operation of Shasta Reservoir during critical hydrologic year types."  (2019 BA at 4-89.)  Among other things, the Proposed Action notes a Resolution adopted by the Sacramento River Settlement

/////

/////

1  (SRS) Contractors[8], pursuant to which, during dryer water years (Tier 3 and Tier 4), the SRS

2  Contractors will meet and confer with Reclamation, NMFS, and other agencies as appropriate to

3  determine if there is any role for the SRS Contractors in connection with Reclamation's

4  operational decision-making for Shasta Reservoir annual operations.  (*Id*.)  While a pre-

5  determined reduction (25%) in deliveries to the SRS Contractors is automatically triggered in

6  certain dry years under their "settlement" contracts, other actions may be considered, including:

7  (1) modifying the scheduling of spring diversions by the SRS Contractors; (2) voluntary,

8  compensated water transfers by the SRS Contractors subject to Reclamation approval; and

9  (3) delayed SRS Contractor diversion for rice straw decomposition during the fall months.  (*Id*.)  The

10  Proposed Action also includes non-flow measures such as spawning and rearing habitat

11  restoration, construction of lower intakes in critical areas, and other fish passage projects.  (*Id*. at

12  4-40 to 4-42.)

13       Overall, however, NMFS conceded in its 2019 BiOp that

14  
15  
16  
17
> The proposed action will result in ongoing adverse effects to Sacramento River winter-run Chinook salmon.  The most significant adverse effects, as described throughout this Opinion, are temperature dependent egg mortality that will occur in all of the Summer Cold Water Pool Management tier types, but most significantly in tier 3 and 4 years.

18  (2019 NMFS BiOp at 753.)

19       NMFS acknowledged that it had previously concluded in 2009 that Water Project

20  operations would "result[] in an appreciable reduction in both the survival and recovery of

21  Sacramento River winter-run Chinook salmon"  and therefore developed the 2009 NMFS BiOp

22  RPA.  (*Id*.)  But in its 2019 BiOp NMFS reasoned that the Proposed Action "includes many

23  components that were developed through an iterative process" that

24  _____

[8]  The SRS Contractors are "individuals and entities . . .  that individually hold settlement
25  agreements (the SRS Contracts) with [ ] Reclamation."  (2019 NMFS BiOp at 8.)  The SRS
Contractors hold "senior" rights that pre-date the CVP and SWP, and thus Reclamation's
26  "without action" scenarios assume these senior rights holders would continue to divert water
under their pre-CVP/SWP rights, because that is what they previously did in absence of the
27  operation of the CVP and SWP.  (BA 3-17.)  Accordingly, Reclamation considers at least certain
aspects of these diversions to be part of the "environmental baseline" for various environmental
28  analyses.  (*See id*.)

> included NMFS sufficiency reviews, draft effects analyses that identified areas where the action was likely to place the individuals and the ESU at high risk, many director meetings where these high risk situations were elevated and Reclamation changed the proposed action to reduce these risks. . . .[T]his iterative process resulted in Reclamation identifying specific actions that would improve Shasta Storage, a commitment to stay within Summer Cold Water Management Tiers, the development of Upper Sacramento Performance Metrics and four and eight year independent panel reviews, a financial commitment to reintroduction work on Battle Creek, Delta Cross Channel operational commitments, and the Delta Performance Objectives to cap juvenile loss at the export facilities at the rates experienced over the past 10 years.

(*Id.* at 753–54.)  NMFS noted that some aspects of the 2009 RPA were not "carried forward" but that Reclamation "adopted" the goals and objectives of those RPA actions; that Reclamation made clear funding commitments to support a plan to create a second population of winter run; that actions in other parts of the ecosystem will help control losses in the Upper Sacramento River.  In sum, the 2019 BiOp states:

> NMFS expects that despite ongoing adverse effects of the Central Valley Project on individuals and their respective populations, and the continued and significant adverse effects that are part of the environmental baseline such as the loss of historical habitat related to the physical presence of Keswick and Shasta Dams, the proposed action also includes measures intended to maintain the abundance, productivity, and diversity, and may improve the spatial structure of the ESU.
>
> ***
>
> After considering its current rangewide status, the environmental baseline within the action area, the effects of the proposed action, effects of any interrelated and interdependent actions, and cumulative effects, NMFS concludes that the proposed action is not likely to appreciably reduce the likelihood of both the survival and recovery of the Sacramento River winter-run Chinook salmon ESU.

(*Id.* at 755–56.)

**E.      Incidental Take Statement**

As part of the 2019 NMFS BiOp, NMFS included an Incidental Take Statement (ITS) that serves to insulate the Proposed Action against ESA liability, so long as its terms are complied with.  16 U.S.C. § 1536(o); *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999).  As the ITS indicates, the Proposed Action creates a variety of stressors, some of which are expected to result in the incidental take of listed species, including

water temperature in the upper Sacramento River.  (2019 NMFS BiOp at 799.)  The ITS articulates the "anticipated" level of take for each Tier level and then indicates that the anticipated level of take will be exceeded if there are:

> o   Two consecutive years of egg-to-fry survival of less than 15 percent followed by a third year of less than 21 percent based on fry production at Red Bluff Diversion Dam.
>
> o   Two consecutive years where temperature-dependent egg mortality modeled from actual operations exceeds the average plus one standard deviation for the tier determined in the annual temperature management plan and egg-to-fry survival is less than average egg-to-fry survival for the tier. Specifically:
>
>> o Under a Tier 1 year, take would be exceeded if, in two consecutive years, temperature-dependent mortality exceeds 15 percent (average of 6 percent plus one standard deviation of 9) and egg-to-fry survival is less than 29 percent.
>>
>> o Under a Tier 2 year, take would be exceeded if, in two consecutive years, temperature-dependent mortality exceeds 31 percent (average of 15 percent plus one standard deviation of 16) and egg-to-fry survival is less than 21 percent.
>>
>> o Under a Tier 3 year, take would be exceeded if, in two consecutive years, temperature-dependent mortality exceeds 65 percent (average of 34 percent plus one standard deviation of 31) and egg-to-fry survival is less than 21 percent.

(*Id.* at 801–802.)

## DISCUSSION

As noted in this court's Delta/Stanislaus PI Order, *PCFFA* has requested a broad preliminary injunction "temporarily setting aside" the 2019 BiOps and prohibiting the Federal Defendants from implementing or taking any actions in reliance on either the 2019 FWS BiOp or the 2019 NMFS BiOp, including prohibiting Reclamation from implementing the Proposed Action in reliance on those BiOps.  (*PCFFA*, Doc. No. 81-1 at 2–3.)  PCFFA has also requested that the court order the Federal Defendants to instead adhere to the operational regime for the Water Projects authorized pursuant to the previously-controlling BiOps issued in 2008 and 2009 by FWS and NMFS, respectively, until this court can resolve the merits of PCFFA's claims asserted in this pending action.  (*Id.* at 2.)

/////

The court is not yet convinced that such wide-ranging relief is justified based upon the present record before it.  First, the Delta/Stanislaus PI Order has substantially narrowed the focus of the court's inquiry, leaving only PCFFA's assertions that salmonids would be harmed by operations in the Upper Sacramento River under the 2019 NFMS BiOp this coming summer and fall.[9]  The court notes that the Proposed Action and the 2019 NMFS BiOp cover a broad geographic area and a wide range of Water Project operations that stretch far beyond the remaining aspects of PCFFA's motion, including operations in the Trinity River and American River watersheds, operation of the Delta Cross Channel, and certain operations in the Sacramento River watershed not directly implicated by temperature management of the Upper Sacramento, to name a few.  (*See generally* 2019 NMFS BiOp.)  PCFFA has simply failed to address many aspects of the Proposed Action in their pending motion, let alone make a showing that an injunction as to <u>all</u> aspects of the Proposed Action would be warranted, lawful, or beneficial to any party or species at issue.

By the same token, however, the court does not agree with the Federal Defendants' argument, which they emphasized at the May 7, 2020 hearing on the PI motions, that the breadth of PCFFA's request warrants outright denial of the remaining aspects of its motion for injunctive relief.  (5/7/2020 Final Transcript (Tr.) at 97.)  An injunction must be narrowly tailored to avoid the identified irreparable harm.  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 886 F.3d 803, 823 (9th Cir. 2018).  It would seem obvious that any such tailoring must be accomplished based upon the current circumstances, *see, e.g., A&M Records, Inc. v. Napster, Inc*., 239 F.3d 1004, 1027 (9th Cir. 2001), as amended (Apr. 3, 2001) (remanding overbroad preliminary injunction for further tailoring through sharing of information between parties), so long as the parties' due process rights are preserved in doing so.  This order is intended, in part, to address the latter concern by requiring PCFFA to more clearly articulate with specificity the injunctive relief it seeks.

---

[9]  Because the 2019 FWS BiOp is focused exclusively on the impact of Delta operations on Delta smelt, there is therefore presently no basis for the imposition of additional injunctive relief related to the 2019 FWS BiOp.

The court also observes that it approaches the remaining issues posed by the pending motion with great caution.  This is an incredibly complex regulatory arena.  As discussed above, two federal agencies with extensive and long-running expertise—NMFS (in fisheries) and Reclamation (in Water Project operations)—have struggled for many years to identify and develop a regulatory regime that is both sufficiently protective of the impacted species and legally and practically feasible.  In prior years of extended drought, these efforts resulted in what all parties appear to characterize as a disaster:  the near extirpation of two brood years (2014 and 2015) of the critically endangered winter-run.  These losses occurred at least in part because Reclamation "lost control" of temperatures in the Upper Sacramento River.  From 2016 through 2019, NMFS and Reclamation (along with others) have both battled and cooperated over the appropriate way forward.  The result of this back-and-forth is before the court in the form of the 2019 NMFS BiOp, which, at least facially, appears to have attempted to address the failures of the past by adjusting the mandated approach to temperature management so as to account for where the fish in need of protection are actually located in any given year[10] and by conserving cold water for the most critical times for incubating eggs, while also attempting, where possible, to provide suitable spawning conditions for those spring-run that spawn in the Upper Sacramento.

The court will assume, without yet deciding, that PCFFA has also made a showing sufficient to raise serious questions as to the validity of the 2019 NMFS BiOp that might empower the court to enter injunctive relief in the Upper Sacramento River if otherwise supported.[11]  Here, for reasons of efficiency, the court will focus first on the issue of irreparable

---

[10]  The court recognizes that PCFFA is concerned that this approach improperly constricts the habitat of these species to an ever-shrinking space.  (*See* Rosenfield Decl. at ¶ 166.)  Whether this is something this court, or anyone else, can have any impact upon with respect to this water year remains entirely unclear to the court.

[11]  The court already found that PCFFA has raised serious questions with regard to how the 2019 NMFS BiOp's loss thresholds purport to control losses of CCV steelhead in the south Delta.  (Doc. No. 106 at 22, 25.).  It is an open question whether that finding would be sufficient to raise a serious question related to a request for injunctive relief in a different geographic area (the Upper Sacramento River) as to a different species.  The court may not have to answer that question, since it is of the tentative opinion that PCFFA has pointed to sufficiently significant problems with the new tiered approach to directly satisfy the "serious questions" standard as to its request for injunctive relief aimed at Shasta Dam temperature management.

1    harm.  PCFFA has pointed to evidence of record —including information provided within the

2    2019 BiOp itself—indicating that the temperature management approach set forth in that BiOp

3    will permit temperature dependent mortality at levels the already imperiled winter-run cannot

4    sustain.  (*See* Rosenfield Decl. ¶¶ 178 (describing temperature related egg mortality permitted by

5    2019 NMFS BiOp as "extraordinarily high"); 183 (explaining that the 2019 NMFS BiOp allows

6    levels of mortality to winter-run that should not even be permitted for a single year to occur in

7    multiple years, a scenario that "is simply not consistent with preventing jeopardy to that

8    species").  Having carefully examined the record, the court believes that plaintiffs have presented

9    sufficient evidence to at least warrant further inquiry into whether irreparable harm will occur as a

10   result of the implementation of the 2019 NFMS BiOp and therefore whether narrowly tailored

11   injunctive relief is warranted under the circumstances.  However, the vast majority of the

12   evidence cited by PCFFA in support of its remaining request is based on information about

13   average mortality trends and is not specific to the conditions presented at this time of this year.[12]

14   Moreover, the court is not yet satisfied that plaintiffs have shown that reversion to the prior

15   temperature management regime will provide any better protection for the winter run during the

16   period of time between now and when the court can rule on the merits of this action.

17           The court recognizes that even if the temperature management requirements of the 2009

18   NMFS BiOp were in place, some (sometimes significant) temperature dependent mortality has

19   occurred historically during dry years such as this one.  (*See* BA 5-29, Figure 5.6-23 (comparing

20   estimated winter run temperature dependent egg mortality using 1922 through 2002 data under

21   the 2009 NMFS BiOp versus the Proposed Action).)  In addition, the record suggests there are

22   real-world tradeoffs involved in temperature management.  For example, generally, under the

23   tiered approach, keeping water temperatures low in the summer may mean that water

24   temperatures are higher than they might otherwise be in September and October, with resulting

25   risk (and likely egg mortality) for later-spawning winter run and those spring-run that spawn in

26   the mainstem Sacramento River.  (*See* generally Rosenfield Decl. at ¶¶ 162–64 (table showing

27   _____

28   [12]  Nor could plaintiff PCFFA be fairly expected to do so, in significant part because, as discussed
     below, the final temperature management plan for this coming season has not yet been released.

1   simulated temperature differentials between operations under the 2019 NMFS BiOp and those

2   authorized under the 2009 NMFS BiOp); *see also id.* at ¶ 165 (discussing NMFS's general

3   conclusion that operations under the 2019 NMFS BiOp will result in mortality of spring-run eggs

4   and fry in the Upper Sacramento River in the late summer and fall).)  Notably, however, the

5   evidence cited by Dr. Rosenfeld suggests that *in a dry year*, temperatures under the tiered

6   approach would actually be <u>lower</u> on average through October under the 2019 NMFS BiOp than

7   they would be were the 2009 NMFS BiOp to be enforced.  (*Id.*)  In the same vein, modeling

8   performed by Reclamation suggests operations under the 2019 NMFS BiOp will result in <u>lower</u>

9   temperature dependent mortality in all but some above-normal (i.e., wetter) year types relative to

10   mortality that would have occurred in that majority of years under the 2009 NMFS BiOp.  (*See*

11   BA at 5-27.)

12        A central question, therefore, is both a very complicated and practical one:  would

13   replacing the 2019 NMFS BiOp's temperature management regime produce a material benefit for

14   the winter run and, relatedly, how would those changes likely impact spring run?  But that is not

15   all.  The court is also concerned that what PCFFA is really asking for is an injunction that would

16   require Reclamation to perform temperature management feats that are neither practically or

17   legally feasible, either because there simply is not enough cold water to accomplish a revised plan

18   or because Reclamation <u>cannot</u> (due to legal or contractual restrictions) make adjustments to the

19   allocations or deliveries sufficient to result in a practical difference in how that cold water is

20   utilized.  The court attempted to question counsel for PCFFA on this issue during the May 7,

21   2020 by inquiring whether PCFFA could point to evidence in the record demonstrating whether it

22   was possible for NMFS to satisfy the 2009 standard.  (Tr. at 147.)  In response, PCFFA pointed

23   generally to the fact that NMFS has in the past "required" Reclamation to reduce allocations to

24   meet temperature targets.  (*Id.*)  Following the May 7 hearing, the court has been able to locate

25   one letter from NMFS to Reclamation indicating that, in that year under the specific conditions

26   presented, NMFS refused to concur with Reclamation's initial allocations to certain water users,

27   suggesting that NMFS at least thought Reclamation could make further adjustments to improve

28   the temperature management situation for the year in question.  (*PCFFA,* Doc. No. 153-6 at 4-5.)

1    That said, NMFS's failure to concur with Reclamation's initial plan in 2018 is not specific to the

2    conditions present this year.  Moreover, it is not clear from the record what, if anything,

3    Reclamation did in response to NMFS's 2018 letter.[13]

4        In addition, at the May 7 hearing PCFFA suggested that all of Reclamation's temperature

5    modeling scenarios assumed "the same amount of diversions and deliveries," presumably in an

6    attempt to establish that Reclamation has never considered making adjustments to its "diversions

7    or deliveries." (Tr. 78–79.)  However, Reclamation's witness testified at that hearing that spring

8    releases were, at least primarily, to satisfy senior water rights holders, with "little flow going to

9    . . . our water service contractors" during that time period.  (*Id*. at 81 (also admitting that these

10   spring releases can impact the cold water pool).)  In sum, the extent to which Reclamation can, in

11   reality, materially improve the availability of cold water remains entirely unclear.[14]

12       This brings us to the present situation.  First, the court recognizes that as of the date of this

13   order, Reclamation has not even finalized its temperature management plan for the season.  (*See*

14   Doc. No. 168-1 at 7 (Reclamation indicating that it anticipates finalizing its Temperature

15   Management Plan on or about May 20, 2020).)  Presumably, the final temperature management

16   plan will be accompanied by an updated analysis of likely instream temperatures and temperature

17   related mortality, along with overall survival estimates.  Without this final information for this

18   year, the record before the court lacks specificity as to the likely impacts of operations this

19   summer and fall.  The court shares PCFFA's concerns over initial evaluations, including that

20   performed by the Salmon Monitoring Team in late March 2020 based upon then-current

21   conditions.  That March evaluation seemed to indicate a range of anticipated temperature

22   dependent mortality in the range of 47-75%, a level that would have exceeded the performance

23   goals set forth in the 2019 NMFS BiOp.  (*PCFFA*, Doc. 153-5 at 31.)  However, more recent

24   _____

25   [13]  The court tentatively is of the opinion that the reality is more complex than this given the numerous constraints (both legal and contractual) Reclamation operates under.

26   [14]  This evidence also makes the court more comfortable in concluding that it needs more

27   information before resolving the remaining aspect of the pending motion for preliminary injunction, even though that will also require additional time.  PCFFA has not come forward with any evidence suggesting that Reclamation could make changes in the near-term that would

28   materially alter the temperature management situation.

1    documents show an improving situation (or at least improved modeling results).  For example,

2    when Reclamation submitted its draft temperature management plan to California's State Water

3    Resources Control Board on April 30, 2020, it presented temperature modeling that appears to be

4    more protective than the scenarios considered by the Salmon Monitoring Team in late March.

5    (*Compare id. with PCFFA*, Doc. No. 168-2 at 4-5.)  The April 30, 2020 document predicts

6    temperature dependent mortality in the range of 27-28%. (*PCFFA*, Doc. No. 168-2 at 10), which

7    would fall below the average temperature related mortality anticipated by NMFS in a Tier 3 year

8    according to the 2019 NMFS BiOp.  (2019 NMFS BiOp at 801) (anticipating an average

9    temperature dependent mortality of 34%).)  As mentioned, PCFFA's expert, Dr. Rosenfield, has

10   opined that the temperature dependent egg mortality rates anticipated in the BiOp are

11   "extraordinarily high" relative to historic levels because "historically, Chinook Salmon would be

12   expected to lose very few eggs to high temperatures alone," but he nonetheless fails to address the

13   practical issue of whether mortality rates are capable of being better controlled under the

14   circumstances presented this year.  (Rosenfield Decl. at ¶ 171.)  Without more, the court would

15   simply be left to speculate whether the anticipated temperature dependent mortality this year is or

16   is not aligned with temperature dependent mortality in similar dry years under the 2009 NMFS

17   BiOp.

18                                      CONCLUSION

19          For all these reasons, before proceeding to resolve the remaining aspect of the pending

20   motion the court will require the submission of the following additional information:

21          (1) First, within 24 hours of its issuance, Reclamation will be required to submit the final

22                temperature monitoring plan along with any supporting analyses related to

23                temperature dependent mortality.

24          (2) In addition, within four days of the issuance of the final temperature management

25                plan, Federal Defendants shall submit a supplemental declaration explaining what, if

26                any, efforts Reclamation has undertaken this water year to model scenarios that might

27                have enabled it to provide better temperature conditions (and, relatedly, lower

28                temperature dependent mortality) in the Upper Sacramento River.  In so doing,

Federal Defendants should attempt to explain with clarity how Reclamation considers its various obligations (discretionary and non-discretionary) in modeling such scenarios.

(3) Once that information is in hand, in order to determine whether planned operations under the Proposed Action and 2019 NMFS BiOp in coming weeks and months are likely to result in harms above and beyond those that would occur under any alternative framework, the court will require additional information from PCFFA, should PCFFA determine it is appropriate to proceed with the remaining aspect of its motion.  Specifically, PCFFA must articulate, with specificity:

    a.  what is it that PCFFA is requesting by way of an injunction;

    b.  an explanation of how, under present conditions (i.e., not based solely upon rough projections set forth in the 2019 NMFS BiOp), the requested injunction would benefit the species of concern;

    c.  identify and assess the possible tradeoffs in terms of impacts (i.e. to spring run or other species) that would likely have to be made if the requested injunction were imposed ; and

    d.  at least a basic showing, understanding that PCFFA may not have access to all of the relevant information, that Reclamation has the ability and sufficient discretionary authority (i.e., is not constrained by other legal or contractual requirements) to implement the requested relief.

(4) Should PCFFA choose to proceed with the remaining aspect of its pending motion, it must address the above issues in a supplemental brief no longer than ten pages in length, exclusive of supporting documentation, within seven (7) days of the filing of Federal Defendants' supplemental declaration.  Thereafter, Federal Defendants shall have seven (7) days to file a response of equal or lesser length.  Defendant Intervenors shall coordinate to file a single (or multiple) briefs that do not exceed ten pages in length total.

/////

(5) If, in light of the content of the final temperature management plan, or for any other reason, PCFFA decides not to further pursue the remaining aspect of its request for injunctive relief, it shall so notify the court by the above deadline.  The court will make every effort thereafter to resolve this case on the merits in as expeditious a manner as possible.

IT IS SO ORDERED.

Dated:   **May 18, 2020**

_____
UNITED STATES DISTRICT JUDGE