1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11
12

PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS, *et al.*,

No. 1:20-cv-00431-DAD-EPG

13

Plaintiffs,

ORDER DENYING WITHOUT
PREJUDICE MOTION FOR
PRELIMINARY INJUNCTION AS TO
SHASTA OPERATIONS

14

v.

15

WILBUR ROSS, *et al.*,

(Doc. No. 81)

16
17

Defendants.

18
19

**INTRODUCTION**

20

Plaintiffs in the above-captioned action, *Pacific Coast Federation of Fishermen's*

21

*Associations v. Ross*, 1:20-CV-00431-DAD-EPG (*PCFFA*), are a coalition of six environmental

22

organizations led by PCFFA (collectively, "PCFFA"). A closely related case, *California Natural*

23

*Resources Agency v. Ross*, No. 1:20-CV-00426-DAD-EPG (*CNRA*), is also pending before the

24

undersigned. In *CNRA*, plaintiffs are the People of the State of California, California's Natural

25

Resources Agency, and California's Environmental Protection Agency (collectively,

26

"California").

27

Both sets of plaintiffs bring claims against the National Marine Fisheries Service (NMFS),

28

the U.S. Fish and Wildlife Service (FWS), the U.S. Bureau of Reclamation (Reclamation), and

1

1   various official representatives of those agencies.  (*CNRA*, Doc. No. 51, First Amended

2   Complaint (FAC); *PCFFA*, Doc. No. 52, FAC.)  Plaintiffs in both cases challenge the adoption by

3   NMFS and FWS, respectively, of a pair of "biological opinions" (BiOps) issued in 2019 pursuant

4   to the Endangered Species Act (ESA), 16 U.S.C § 1531 *et seq.*, regarding the impact on various

5   ESA-listed species of implementing Reclamation's updated plan for the long-term operation of

6   the Central Valley Project (CVP) and the State Water Project (SWP) (collectively, "Water

7   Projects" or "Proposed Action").  FWS's 2019 BiOp (2019 FWS BiOp) addressed the impacts of

8   the Proposed Action on Delta smelt, while NMFS's 2019 BiOp (2019 NMFS BiOp) addressed

9   the impacts of the updated plan upon, among others, three species of salmonids:  winter-run

10   Chinook salmon (winter-run) and spring-run Chinook salmon (spring-run), and California Central

11   Valley steelhead (CCV steelhead).  All plaintiffs allege that NMFS and FWS violated the

12   Administrative Procedure Act (APA), 5 U.S.C. § 706, in various ways by concluding that the

13   Water Projects would not jeopardize the continued existence of the ESA-listed species addressed

14   in each biological opinion.  Both sets of plaintiffs also bring claims against Reclamation under the

15   ESA for unlawfully relying on the 2019 BiOps in formally adopting and implementing the

16   Proposed Action, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*[1]

17        In an order issued on May 11, 2020, the court resolved certain aspects of overlapping

18   requests for preliminary injunctive relief filed by PCFFA and California, namely issues related to

19   species impacts caused by the Water Projects' export pumping operations in the southern portion

20   of the Sacramento-San Joaquin Delta (Delta) as well as potential impacts related to the operation

21   of New Melones Dam on the Stanislaus River.  (*CNRA*, Doc. No. 106; *PCFFA*, Doc. No. 173

22   (Delta/Stanislaus PI Order).)  However, in part in order to expedite the issuance of its May 11,

23   2020 ruling, the court held in abeyance certain issues raised in PCFFA's motion for preliminary

24   injunction (*PCFFA* PI Motion) concerning instream temperature management measures aimed at

25   /////

---

[1]  California's complaint in *CNRA* also alleges that Reclamation has violated the APA by failing to comply with measures California put in place under the California Endangered Species Act (CESA) to protect Longfin smelt, compliance with which California alleges is required by various provisions of federal law.

protecting winter-run and spring-run eggs and juveniles in the reaches of the Upper Sacramento River below Shasta and Keswick Dams.  (*See id*.)

On May 18, 2020, the court ordered the parties to submit supplemental information and briefing addressing the remaining Upper Sacramento temperature management issues posed by the pending motion.  (Doc. No. 179.)  First, recognizing that Reclamation had yet to issue a final temperature management plan for the Upper Sacramento River and that the facts on the ground were evolving, the court ordered Reclamation to submit the final plan, which was due to be released only a few days later—on May 20, 2020.  (*Id*. at 18)  The court also ordered the Federal Defendants to submit supplemental information indicating what, if any, efforts had been undertaken this water year to model temperature management scenarios that might have enabled Reclamation to provide more favorable temperature conditions (and, relatedly, lower temperature dependent mortality) in the Upper Sacramento River.  (*Id*. at 18–19.)  Thereafter, PCFFA was permitted to supplement its motion by articulating, with specificity:  (a) what PCFFA is requesting by way of an injunction; (b) how, under present conditions (i.e., not based solely upon rough projections set forth in the 2019 NMFS BiOp), the requested injunction would benefit the species of concern; and (c) the possible tradeoffs in terms of impacts (i.e. to spring run or other species) that would likely have to be made if the requested injunction were granted.  (*Id*. at 20.)  In addition, PCFFA was directed to provide "at least a basic showing, understanding that PCFFA may not have access to all of the relevant information, that Reclamation has the ability and sufficient discretionary authority (i.e., is not constrained by other legal or contractual requirements) to implement the requested relief."  (*Id*.)

In keeping with the supplemental briefing schedule, Reclamation submitted the final temperature management plan to the court on May 21, 2020.  (Doc. No. 182.)  On May 24, 2020, Federal Defendants submitted the Third Declaration of Kristin White.  On June 1, 2020, PCFFA submitted a supplemental brief along with numerous attachments.  (Doc. No. 185.)  Federal Defendants submitted a response on June 8, 2020, along with several declarations and attachments.  (Doc. No. 188.) Defendant Intervenors also submitted a combined responsive brief, along with objections to evidence offered by PCFFA.  (Doc. Nos. 189, 190.)

Having carefully reviewed the extensive record and for the reasons set forth below, the court will deny PCFFA's motion for preliminary injunction as to Shasta operations without prejudice.

## FACTUAL BACKGROUND

### A.      Winter-Run, Spring-Run and Shasta Dam

Winter-run are listed as endangered under the ESA.  (*PCFFA*, Doc. No. 85-2 (2019 NMFS BiOp) at 65.)  Before construction of Shasta Dam, the winter-run had access to the Sacramento River upstream of Shasta Dam's present location and to the upper tributaries where springs provided cold water throughout the summer.  (*Id*. at 69–70.)  Shasta Dam and Keswick Dam (a smaller, regulating dam that sits nine miles downstream of Shasta) block access to this extensive former spawning habitat.  (*Id*. at 70.)  As a result, the only population of winter-run spawns exclusively in the reaches of the Upper Sacramento River below Keswick Dam and this "single population . . . has been supported by cold water management operations at Shasta Dam." (*Id*.)  Generally, winter-run adults migrate upstream through the San Francisco Bay-Delta region during the winter and spring months and spawn in the upper Sacramento river in the summer months.  (*Id*. at 70–71.)[2]  The ocean stage of the winter run life cycle typically lasts three years. (*PCFFA*, Doc. No. 85-18 (2009 NMFS BiOp) at 87.)

Spring-run are listed as threatened under the ESA.  (2019 NMFS BiOp at 79.)  They are somewhat more geographically widespread than winter-run, with populations at varying levels of viability known to spawn on several tributaries to the Sacramento River.  (*Id*. at 89.)  The ocean stage of the spring-run life cycle typically lasts one to five years.  (*Id*. at 88.)  Spring-run adults typically migrate upstream, unsurprisingly, in the spring, from January to June.  (*Id*. at 89.)  In at least one location (Clear Creek), adult spring-run "hold" for several months in the mid-to-late summer before spawning in September and October.  (*Id*. at 85.)  Some spawning also occurs in

---

[2]  According to the 2019 NMFS BiOp:  "Sacramento River winter-run Chinook salmon are particularly important among California's salmon runs because they exhibit a life-history strategy found nowhere else in the world.  These Chinook salmon are unique because they spawn during the summer months when air temperatures usually approach their warmest.  As a result, winter-run Chinook salmon require stream reaches with cold-water sources to protect their incubating eggs from the warm ambient conditions."  (*Id*. at 65.)

4

the mainstem Sacramento River (*id*. at 89), although the numbers of fish spawning there have generally been limited in recent years.  (*Id*. at 91.)  Juvenile spring-run exhibit varied rearing behavior and outmigration timing.  Some juveniles may reside in upstream areas for 12 to 16 months (these individuals are characterized as "yearlings"), while some may migrate to the ocean shortly after hatching as "young-of-the-year."  (*Id*. at 85.)

Shasta Dam is equipped with a temperature control device (TCD) that allows Reclamation to control the temperature of water released from the Dam.  (*PCFFA,* Doc. No. 85-12 (2019 Biological Assessment (BA)) at 4-26.)  "The TCD has four levels of gates from which water can be drawn."  (*Id*.)  During mid-winter and early spring, Reclamation uses the highest possible elevation gate(s) to draw from the upper levels of the lake and conserve the deeper, colder water.  (*Id*. at 4-27.)  During late spring and summer, as Shasta Reservoir elevation decreases, Reclamation progresses to open deeper gates to release the colder water.  (*Id*.)

Generally, temperature management below Shasta/Keswick involves the release of cold water to meet target temperatures at various temperature compliance points (TCP) along the Sacramento River.  Keswick Dam is located at River Mile 302.  (2019 BA at 2-13.[3])  The furthest upstream TCP is Clear Creek (about 10 river miles below Keswick), then Airport Road Bridge (15 river miles below Keswick), Balls Ferry (25 river miles below Keswick), and Bend Bridge (44 river miles below Keswick).  (*Id*.)  The general purpose of these temperature compliance points is to keep water temperatures cool enough to avoid damaging salmon eggs, a phenomenon known as "temperature-dependent mortality."  (*See* BA 4-29; *PCFFA*, Doc. No. 82, Declaration of Dr. Jonathan Rosenfield (Rosenfield Decl.) at ¶ 138.)

**B.       2009 NMFS BiOp & RPA**

On June 4, 2009, NMFS issued, and Reclamation accepted, a BiOp that concluded that "the long-term operations of the CVP and SWP are likely to jeopardize the continued existence" of various listed species, including winter-run and spring-run, and "destroy or adversely modify"

---

[3]  While the parties have submitted excerpts from the 2019 BA, the court here references pages from the complete document, which is available at:  https://www.usbr.gov/mp/bdo/docs/ba-final-biological-assessment.pdf (last visited June 10, 2020).

those species' critical habitats.  (2009 NMFS BiOp at 575.)  Specifically, as relevant to this order, the 2009 NMFS BiOp explained that:

> Water operations result in elevated water temperatures that have lethal and sub-lethal effects on egg incubation and juvenile rearing in the upper Sacramento River.  The immediate operational cause is lack of sufficient cold water in storage to allow for cold water releases to reduce downstream temperatures at critical times and meet other project demands.  This elevated temperature effect is particularly pronounced in the Upper Sacramento for winter-run and mainstem spring-run, and in the American River for steelhead.  The RPA includes a new year-round storage and temperature management program for Shasta Reservoir and the Upper Sacramento River, as well as long-term passage prescriptions at Shasta Dam and re-introduction of winter-run into its native habitat in the McCloud and/or Upper Sacramento rivers.

(*Id*. at 576–77.)

As required under the ESA, *see* 16 U.S.C. §§ 1536(a)(2), (b)(3)(A), the BiOp included a "Reasonable and Prudent Alternative" (2009 RPA) designed to allow the projects to continue operating without causing jeopardy to the species or adverse modification to its critical habitat. (*Id*. at 575–671).  Most relevant here, for the summer, as part of "Action Suite I.2" of the 2009 RPA, Reclamation was required to develop a temperature management plan and implement Shasta Dam operations to achieve daily average water temperatures not in excess of 56°[F] between Balls Ferry and Bend Bridge from May 15 through September 30 for the protection of winter-run, and not in excess of 56°[F] between Balls Ferry and Bend Bridge from October 1 through October 31 for the protection of spring-run in the mainstem Sacramento River "whenever possible." (*Id*. at 601.)  The 2009 RPA acknowledged that "extending the range of suitable habitat by moving the compliance point downstream from Balls Ferry" must be balanced against the need to conserve storage in order to accumulate a sufficient cold water pool for use during the subsequent temperature management season. (*Id*. at 602.)  The 2009 RPA also provided drought exception procedures and contingency plans if these temperatures could not be achieved. (*Id*. at 600.)[4]

---

[4] The 2009 Shasta Dam RPA also created long-term performance measures related to Reclamation's success at maintaining appropriate temperature control and the volume of stored water carried over through the winter into the subsequent season. (*Id*. at 592.)

**C.     Loss of Temperature Control in 2014 & 2015; Reinitiation of Consultation**

In 2014 California was in the third year of a drought.  (2019 NMFS BiOp at 69.)
According to PCFFA's expert, Dr. Rosenfield, early in 2014, Reclamation moved the temperature
compliance point "far upstream above Clear Creek's confluence with the Sacramento River,"
predicting it could provide required water temperatures to that point.  (Rosenfield Decl. at ¶ 171.)
However, despite initial modeling that indicated compliance was possible and despite
Reclamation obtaining various waivers from state Delta outflow requirements that Reclamation
asserted were necessary to maintain appropriate water temperatures, river temperatures at the
revised temperature control point nonetheless exceeded 56°F.  (*Id.*)  This resulted in temperature
dependent egg mortality in 2014 of 77% (*id.*) and extremely poor egg-to-fry survival (measured
as the percentage of eggs that survived to produce fry capable of passing Red Bluff Diversion
Dam on the lower Sacramento River) of approximately 4%.  (2019 NMFS BiOp at 69) (citations
omitted).

The story was much the same in 2015.  (*See* Rosenfield Decl. at ¶ 172.)  Indeed, egg-to-
fry survival that year was the lowest on record (approximately 3%), "due to the inability to
release cold water from Shasta Dam in the fourth year of the drought."  (*Id.*)  As a result, and as
the 2019 NMFS BiOp explains, "[w]inter-run [] returns in 2016 to 2018 were low, as expected,
due at least in part to poor in-river conditions for juveniles from brood year 2013 to 2015 during
drought years."  (*Id.*)  Although "[t]he 2018 adult winter-run return (2,639) improved from 2017
(977)," it was "dominated by hatchery-origin fish."  (*Id.*)

NMFS acknowledged the precarious situation of the winter run in a 2016 request for re-
initiation of the inter-agency consultation process required by the ESA, *see* 16 U.S.C. § 1536,
stating:  "recent data demonstrate []extremely low abundance levels for endangered Sacramento
River winter-run. . . ."  (*PCFFA*, Doc. No. 85-5 at 2.)  NMFS also drafted an amendment to the
2009 RPA actions related to Upper Sacramento temperature management.  (*PCFFA*, Doc. No. 85-

/////

/////

/////

7

8.)[5]  That draft RPA amendment called for Reclamation to operate Shasta Dam to ensure that temperatures did not exceed 56°F daily average temperature at a compliance location between Balls Ferry and Bend Bridge from the start of winter-run spawning, based on aerial redd[6] or carcass[7] surveys, through 100% winter-run "emergence" (i.e., when the eggs hatch).  (*Id*. at 18.) The draft also called for the maintenance of 56°F daily average temperatures at the same compliance location through October 31 for protection of mainstem spring run "whenever possible."  (*Id*.)  Among other things, the draft also proposed to place strict limits on temperature dependent mortality below Shasta Dam.  (*Id*. at 14 (proposing that temperature dependent mortality should not exceed 30% in critically dry years, 8% in dry years, and 3% in below normal, above normal, and wet years).)  Reclamation responded to that proposal by indicating that additional work would be needed to ensure that the objectives identified by NMFS were "feasible, scientifically sound, and address[ed] impacts to the other requirements and beneficial uses of the CVP and SWP."  (*PCFFA*, Doc. No. 85-9 at 2.)

The 2019 NMFS BiOp describes how temperature management was actually implemented from 2016 through the issuance of the 2019 BiOp as follows:

> On August 2, 2016, Reclamation requested using the adaptive management provision in the NMFS 2009 Opinion related to Shasta Reservoir operations.  The basis for this request included recent, multiple years of drought conditions, new science and modeling, and data demonstrating the low population levels of endangered winter-run Chinook salmon and threatened CV spring-run Chinook salmon.  In response, Reclamation implemented a 2017 pilot approach that applied new science on the thermal tolerance of Chinook salmon eggs (Martin et al. 2016) and which was designed to efficiently utilize Shasta Reservoir's limited supply of cold water by basing the spatial distribution of protective temperatures on the within-season spatial distribution of winter-run Chinook salmon

---

[5]  In connection with their supplemental filings, Defendant Intervenors object to the court's consideration of this document on various grounds.  (Doc. No. 190 at 6–7.)  However, here the court is simply considering the document as part of the consultation history and context, not for the truth of the matters addressed therein.  Nothing in Defendant Intervenors' objections suggests consideration of this document for contextual purposes is improper.

[6]  Salmon eggs incubate for weeks to months in gravel nests, known as redds.  (Rosenfeld Decl. at ¶ 136.)

[7]  Chinook salmon die after spawning.  (Rosenfeld Decl. at ¶ 136.)

redds.  The intent was to provide daily average water temperatures of 53°F or less to the Clear Creek gauging station as a surrogate for the furthest downstream redds.  The 2009 RPA requirement was a daily average temperature of 56°F or less at compliance locations between Balls Ferry and Bend Bridge, which are not based on the within-season redd distribution.  [T]he 2017 pilot approach, along with one of the wettest years on record (in water year 2017), resulted in an estimated 44 percent egg-to-fry survival, one of the highest estimates on record.  The pilot approach was implemented in 2018 and . . . 2019.  In July 2019, CDFW aerial redd surveys indicated redd distribution was further downstream than the targeted temperature management location at CCR.  Per the request of the fish agencies, and as a result of Reclamation's temperature modeling that indicated the operation was feasible, on August 7, 2019, Reclamation initiated temperature management to target 53.5°F at the Airport Road location.

(2019 NMFS BiOp at 173.)

**D.    The 2019 NMFS BiOp**

Further consultation between NMFS and Reclamation, including at one point the issuance of a draft "jeopardy" opinion by NMFS (*PCFFA*, Doc. No. 85-13), resulted in revisions to the final Proposed Action and ultimately to the issuance by NMFS of a "no jeopardy" biological opinion.  (*See generally* 2019 NMFS BiOp.)  The final Proposed Action implements a tiered Shasta temperature management strategy designed, at least facially, to account for the real-time spatial and temporal distribution of redds designed to attempt to conserve cold water for use when it is most needed.  The operation manager of Reclamation's Central Valley Office, Kristin White, describes this tiered approach generally as follows.

The tiered strategy recognizes that cold water is a scarce resource and that additional measures may be required when hydrology and meteorology do not provide sufficient cold water to avoid temperature dependent mortality throughout the entire temperature management period.  The tiered strategy is intended to optimize use of cold water at Shasta for Winter-Run Chinook Salmon eggs based on life-stage-specific requirements during the temperature management season.

(*PCFFA*, Doc. No. 119-1, Declaration of Kristin White (White Decl.) at ¶ 23 (citing BA at 4-31 to 4-32).)

NMFS concluded that the Clear Creek TCP serves as a reliable surrogate for controlling temperatures at the farthest downstream redd location.  (*See* 2019 NMFS BiOp at 173, 237.)

9

Although historically spawning was expected to begin in April, in recent years, the onset of spawning has been later—into May and June.  (2019 NMFS BiOp at 243–4.)  The tiered strategy adopts the view that using cold water too early (i.e., before redds are deposited) and/or to meet a TCP too far downstream of the actual location of redds, wastes cold water that is needed later in the season during the critical incubation season.  Thus, the tiered strategy "allows for strategically selected temperature objectives," based on projected total storage, the available "cold water pool," meteorology, and downstream conditions (which can influence how much water Reclamation must release for other reasons), among other things.  (2019 BA at 4-28.)

The temperature targets for each "Tier" are as follows:

- In Tier 1 years, Reclamation will operate to maintain daily average temperatures of 53.5°F at Clear Creek throughout the entire temperature management season (May 15 through Oct 30).  (2019 NMFS BiOp at 241–2.)

- In Tier 2, Reclamation will target 53.5°F during the "critical egg incubation period." (*Id*. at 242.)

- Tier 3 is the proposed operation when the cold water pool in Shasta Reservoir on May 1 is less than 2.3 million acre-feet <u>or</u> when modeling suggests that maintaining 53.5°F at the Clear Creek TCP would have higher mortality than a warmer temperature.  (*Id*.) In a Tier 3 year, Reclamation would target 53.5°F–56°F degrees during the critical egg incubation period and would consider "intervention measures."[8]  (*Id*.)  Reclamation would not allow temperatures to exceed 56°F but would decrease temperatures to below that during the periods of greatest temperature stress on the species.  (*Id*.)

- Tier 4 conditions are "defined by mid-March storage and operations forecasts of Shasta Reservoir total storage less than 2.5 million acre-feet at the beginning of May, or if Reclamation cannot meet 56°F at Clear Creek gauge."  (*Id*. at 243.)  In this scenario, "Reclamation proposes to initiate discussions with FWS and NMFS on

---

[8]  "Intervention measures" would include "consulting with []FWS and NMFS, increasing hatchery intake, adult rescue, and juvenile trap and haul."  (*Id*. at 249.)  NMFS notes in the 2019 NMFS BiOp that "any benefits from implementation of these measures is not included in results presented [therein] due to their inability to be characterized by the modeling."  (*Id*. at 243.)

1               potential intervention measures to address low storage conditions that continue into

2               April and May."  (*Id*. at 243.)

3  There is no dispute between the parties that this year, circumstances place the Water Projects into

4  Tier 3.  (Tr. 101.)

5        NMFS reviewed the tiered management strategy in some detail in the 2019 NMFS BiOp

6  and summarized its own evaluation of the impacts that it anticipated would result from operations

7  under each of these Tiers.

8       •   In Tier 1 years, NMFS expects an average modeled temperature dependent egg

9             <u>survival</u> of 94–95%.  (*Id*. at 241–2.)  Reclamation is expected to operate under Tier 1

10           in 68% of years.  (*Id*.)

11       •   In Tier 2 years, average modeled temperature dependent egg survival is anticipated to

12           be 85–88%, which is expected to occur in 17% of years.  (*Id*. at 750.)

13       •   Modeling suggests Tier 3 would be in place for 7–15% of years.  (*Id*. at 243, 248.)

14           The 2019 NMFS BiOp indicates that temperature conditions in a Tier 3 year would

15           result in an estimated temperature-dependent mortality of between 28% and 34%

16           according to the two dominant modeling approaches, respectively.  (*Id*.)

17       •   NMFS expects Tier 4 conditions to exist in five to 7% of years.  (*Id*. at 252.) Modeling

18           indicates that during Tier 4 years, 53.5°F is exceeded on 86% of days that fall within

19           the temperature management period.  (*Id*.)  "This exposure corresponds to an

20           estimated temperature-dependent mortality in Tier 4 years of between 79% and 81%."

21           (*Id*.)

22        Reclamation's Proposed Action, as analyzed in the 2019 NMFS BiOp, plans for certain

23  other measures designed with an intent to benefit winter-run.  Within 18 months of adoption of

24  the Proposed Action, Reclamation will develop a "voluntary toolkit to be exercised at the

25  discretion of Reclamation, DWR, other agencies, participating water users, and/or others for the

26  operation of Shasta Reservoir during critical hydrologic year types."  (2019 BA at 4-89.)  Among

27  other things, the Proposed Action notes a Resolution adopted by the Sacramento River Settlement

28  /////

1    (SRS) Contractors[9], pursuant to which, during dryer water years (Tier 3 and Tier 4), the SRS

2    Contractors will meet and confer with Reclamation, NMFS, and other agencies as appropriate to

3    determine if there is any role for the SRS Contractors in connection with Reclamation's

4    operational decision-making for Shasta Reservoir annual operations.  (*Id*.)  While a pre-

5    determined reduction (25%) in deliveries to the SRS Contractors is automatically triggered in

6    certain dry years under their "settlement" contracts, other actions may be considered, including:

7    (1) modifying the scheduling of spring diversions by the SRS Contractors; (2) voluntary,

8    compensated water transfers by the SRS Contractors subject to Reclamation approval; and

9    (3) delayed SRS Contractor diversion for rice straw decomposition during the fall months.  (*Id*.)

10   The Proposed Action also includes non-flow measures such as spawning and rearing habitat

11   restoration, construction of lower intakes in critical areas, and other fish passage projects.  (*Id*. at

12   4-40 to 4-42.)

13         Overall, however, NMFS conceded in its 2019 BiOp that

14         The proposed action will result in ongoing adverse effects to
           Sacramento River winter-run Chinook salmon.   The most
15         significant adverse effects, as described throughout this Opinion,
           are temperature dependent egg mortality that will occur in all of the
16         Summer Cold Water Pool Management tier types, but most
           significantly in tier 3 and 4 years.
17

18   (2019 NMFS BiOp at 753.)

19         NMFS acknowledged that it had previously concluded in 2009 that Water Project

20   operations would "result[] in an appreciable reduction in both the survival and recovery of

21   Sacramento River winter-run Chinook salmon"  and therefore developed the 2009 NMFS BiOp

22   RPA.  (*Id*.)  But in its 2019 BiOp, NMFS reasoned that the Proposed Action "includes many

23   components that were developed through an iterative process" that

24   _____

     [9]  The SRS Contractors are "individuals and entities . . .  that individually hold settlement
25   agreements (the SRS Contracts) with [ ] Reclamation."  (2019 NMFS BiOp at 8.)  The SRS
     Contractors hold "senior" rights that pre-date the CVP and SWP, and thus Reclamation's
26   "without action" scenarios assume these senior rights holders would continue to divert water
     under their pre-CVP/SWP rights, because that is what they previously did in absence of the
27   operation of the CVP and SWP.  (BA 3-17.)  Accordingly, Reclamation considers at least certain
     aspects of these diversions to be part of the "environmental baseline" for various environmental
28   analyses.  (*See id*.)

> included NMFS sufficiency reviews, draft effects analyses that identified areas where the action was likely to place the individuals and the ESU at high risk, many director meetings where these high risk situations were elevated and Reclamation changed the proposed action to reduce these risks. . . . [T]his iterative process resulted in Reclamation identifying specific actions that would improve Shasta Storage, a commitment to stay within Summer Cold Water Management Tiers, the development of Upper Sacramento Performance Metrics and four and eight year independent panel reviews, a financial commitment to reintroduction work on Battle Creek, Delta Cross Channel operational commitments, and the Delta Performance Objectives to cap juvenile loss at the export facilities at the rates experienced over the past 10 years.

(*Id*. at 753–54.)  NMFS noted that some aspects of the 2009 RPA were not "carried forward" but that Reclamation "adopted" the goals and objectives of those RPA actions; that Reclamation made clear funding commitments to support a plan to create a second population of winter run; that actions in other parts of the ecosystem will help control losses in the Upper Sacramento River.  In sum, the 2019 BiOp states:

> NMFS expects that despite ongoing adverse effects of the Central Valley Project on individuals and their respective populations, and the continued and significant adverse effects that are part of the environmental baseline such as the loss of historical habitat related to the physical presence of Keswick and Shasta Dams, the proposed action also includes measures intended to maintain the abundance, productivity, and diversity, and may improve the spatial structure of the ESU.
>
> ***
>
> After considering its current rangewide status, the environmental baseline within the action area, the effects of the proposed action, effects of any interrelated and interdependent actions, and cumulative effects, NMFS concludes that the proposed action is not likely to appreciably reduce the likelihood of both the survival and recovery of the Sacramento River winter-run Chinook salmon ESU.

(*Id*. at 755–56.)

## E.   Incidental Take Statement

As part of the 2019 NMFS BiOp, NMFS included an Incidental Take Statement (ITS) that serves to insulate the Proposed Action against ESA liability, so long as its terms are complied with.  16 U.S.C. § 1536(o); *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d

1156, 1159 (9th Cir. 1999) ("In addition, if NMFS concludes that no jeopardy exists or that RPAs

would avoid jeopardy and that the incidental taking of endangered or threatened species will not

violate section 7(a)(2), NMFS must issue an Incidental Take Statement specifying the conditions

under which incidental taking may occur.") (citing 16 U.S.C. § 1536(b)(4)).  As the ITS indicates,

the Proposed Action creates a variety of stressors, some of which are expected to result in the

incidental take of listed species, including water temperature in the upper Sacramento River.

(2019 NMFS BiOp at 799.)  The ITS articulates the "anticipated" level of take for each Tier level

and then indicates that the anticipated level of take will be exceeded if there are:

> o  Two consecutive years of egg-to-fry survival of less than 15 percent followed by a third year of less than 21 percent based on fry production at Red Bluff Diversion Dam.
>
> o  Two consecutive years where temperature-dependent egg mortality modeled from actual operations exceeds the average plus one standard deviation for the tier determined in the annual temperature management plan and egg-to-fry survival is less than average egg-to-fry survival for the tier. Specifically:
>
>> o Under a Tier 1 year, take would be exceeded if, in two consecutive years, temperature-dependent mortality exceeds 15 percent (average of 6 percent plus one standard deviation of 9) and egg-to-fry survival is less than 29 percent.
>>
>> o Under a Tier 2 year, take would be exceeded if, in two consecutive years, temperature-dependent mortality exceeds 31 percent (average of 15 percent plus one standard deviation of 16) and egg-to-fry survival is less than 21 percent.
>>
>> o Under a Tier 3 year, take would be exceeded if, in two consecutive years, temperature-dependent mortality exceeds 65 percent (average of 34 percent plus one standard deviation of 31) and egg-to-fry survival is less than 21 percent.

(*Id*. at 801–802.)

**F.     The 2020 Temperature Management Plan**

Reclamation finalized its temperature management plan for this year on May 20, 2020.

(*See* Doc. No. 182-2 (2020 TMP).)  As mentioned, it is undisputed that current hydrologic

conditions render 2020 a "Tier 3" year under the 2019 NMFS BiOp's tiered management system.

In accordance with the BiOp's definition of Tier 3 years (*see* 2019 NMFS BiOp at 242), the 2020

TMP indicates that, given the available cold water pool as of May 1, 2020, Reclamation "cannot maintain" 53.5°F at the temperature compliance point above Clear Creek for the entire temperature management season (May 15 through October 31), but a temperature between 53.5°F and 56°F can be maintained for shorter periods of time.  (*See* Doc. No. 182-2 at 1.)  Specifically, after modeling various scenarios, Reclamation chose from those scenarios a strategy that anticipates targeting the following temperatures at Clear Creek (CCR) and Balls Ferry (BSF) compliance points:

| Week Beginning | CCR | BSF |
|---|---|---|
| April 30, 2020 | | 56.0 |
| May 7, 2020 | | 56.0 |
| May 14, 2020 | 54.5 | 56.0 |
| May 21, 2020 | 54.5 | 56.0 |
| May 31, 2020 | 53.5 | 56.0 |
| June 7, 2020 | 53.5 | 56.0 |
| June 14, 2020 | 53.5 | 56.0 |
| June 21, 2020 | 53.5 | 56.0 |
| June 30, 2020 | 54.0 | 56.0 |
| July 7, 2020 | 54.0 | 56.0 |
| July 14, 2020 | 54.0 | 56.0 |
| July 21, 2020 | 54.0 | 56.0 |
| July 31, 2020 | 54.0 | 56.0 |
| August 7, 2020 | 54.0 | 56.0 |
| August 14, 2020 | 54.0 | 56.0 |
| August 21, 2020 | 54.0 | 56.0 |
| August 31, 2020 | 54.0 | 56.0 |
| September 7, 2020 | 54.0 | 56.0 |
| September 15, 2020 | 54.0 | 56.0 |
| September 21, 2020 | 56.0 | |
| September 30, 2020 | 56.0 | |
| October 7, 2020 | 56.0 | |
| October 14, 2020 | 56.0 | |
| October 21, 2020 | 56.0 | |
| October 31, 2020 | 56.0 | |

(Adapted from Doc. 182-2 at 8–9 (Table 2).)  According to Reclamation, "[t]he planned temperature management operation anticipates targeting the compliance point that encompasses the majority of the winter-run Chinook salmon redds." (*Id*. at 8.)  Reclamation applied two modeling approaches to estimate the temperature dependent mortality that may occur as a result of the implementation of the 2020 temperature management plan.  According to the "Martin" model, temperature dependent mortality will be 28%; according to the "Anderson" model, temperature dependent mortality will be 15% for the chosen management approach.  (*Id*. at 3.)

## STANDARD OF DECISION

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'" (citation omitted)); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (internal quotation and citation omitted).[10]  For the purposes of injunctive relief,

> "serious questions" refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo.  Serious questions are substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.

---

[10]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test." *All. for the Wild Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. at 1135.

1    *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (quotations marks and
2    citation omitted).

3         The party seeking an injunction bears the burden of proving these elements.  *Klein v. City*
4    *of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v.*
5    *Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted) ("A plaintiff must do more than
6    merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate
7    immediate threatened injury as a prerequisite to preliminary injunctive relief.").  Finally, an
8    injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the
9    plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

10        An injunction must be narrowly tailored to avoid the identified irreparable harm.  *Nat'l*
11   *Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018).  "There must
12   be a sufficient causal connection between the alleged irreparable harm and the activity to be
13   enjoined, but a plaintiff need not further show that the action sought to be enjoined is the
14   exclusive cause of the injury."  *Id.* (internal quotation and citation omitted).  Moreover, "[i]t is not
15   an abuse of discretion for a court to issue an injunction that does not completely prevent the
16   irreparable harm that it identifies."  *Id.*

17                              **REQUESTED INJUNCTIVE RELIEF**

18        As noted in this court's Delta/Stanislaus PI Order, PCFFA originally requested a broad
19   preliminary injunction "temporarily setting aside" the 2019 BiOps and prohibiting the Federal
20   Defendants from implementing or taking any actions in reliance on either the 2019 FWS BiOp or
21   the 2019 NMFS BiOp, including prohibiting Reclamation from implementing the Proposed
22   Action in reliance on those BiOps.  (*PCFFA*, Doc. No. 81-1 at 2–3.)  PCFFA also requested that
23   the court order the Federal Defendants to instead adhere to the operational regime for the Water
24   Projects authorized pursuant to the previously-controlling BiOps issued in 2008 and 2009 by
25   FWS and NMFS, respectively, until this court can resolve the merits of PCFFA's claims asserted
26   in this action.  (*Id.* at 2.)

27        In part because the 2008 FWS and 2009 NMFS BiOps covered a wide range of Water
28   Project operations, many of which were wholly unaddressed in the briefing submitted in support

                                         17

1    of and in opposition to the motion for preliminary injunction, the court's May 18, 2020 Order,

2    sought clarification from PCFFA as to the specific relief requested in connection with Shasta

3    operations. (*See* Doc. No. 179 at 14.) In response, PCFFA has indicated that it is seeking to have

4    the court enter a preliminary injunction requiring compliance with the entirety of the 2009 NMFS

5    BiOp RPA directed at Shasta Operations, referred to in that document as "Action Suite I.2."

6    (Doc. No. 185 at 3; *see also* 2009 NMFS BiOp at 590–603.)[11] PCFFA argues that the granting of

7    such an injunction would mandate compliance with the following "requirements" of Action Suite

8    I.2:

9              (1) that Reclamation use more conservative modeling to plan
10             temperature management operations; (2) that Reclamation meet a
               temperature compliance point of 56°F between Balls Ferry and
11             Bend Bridge for the duration of the temperature management
               season (May through October), including by reducing all
12             discretionary CVP contract allocations as needed to achieve that
               temperature control point; and (3) that NMFS have authority to
13             approve all CVP allocations and operations plans and require
               changes therein to achieve the preferred temperature compliance
14             point.

15   (Doc. No. 185 at 4.)[12]

16                                         **DISCUSSION**

17           For purposes of this discussion, the court will assume without deciding that plaintiffs have

18   raised a serious question going to the merits of the 2019 NMFS BiOp's tiered system by, among

19   other things, calling into question how NMFS could possibly conclude that the Proposed Action

20   poses no jeopardy to the already seriously imperiled winter-run, given the amount of temperature

21   _____

22   [11] Federal Defendants point out, correctly, that certain aspects of Action Suite I.2 pertain to time
     periods that have already come and gone for purposes of injunctive relief. (Doc. No. 188 at 4.)
23   For example, Action Suite I.2 contains a spring action covering February through March (*see*
     2009 NMFS BiOp at 592–97) and provides for a planning period that spans April 15, through
24   May 15 (*id.* at 602). Federal Defendants' suggestion that the injunction sought by PCFFA is
     overbroad simply because these steps do not (or at least no longer) pertain to summer temperature
25   management puts form over substance in the court's view. Plaintiffs obviously are not requesting
     that the court go back in time. The request to impose the remaining aspects of Action Suite I.2 is
26   discrete enough to permit evaluation here.

27   [12] Federal Defendants and Defendant Intervenors maintain that PCFFA's motion is based on a
     mischaracterization of the requirements of the 2009 NMFS BiOp. (*See* Doc. Nos. 188 at 5; Doc.
28   189 at 5.) Where material, the court addresses aspects of that dispute in this order.

1   dependent mortality allowed under that BiOp.  Assuming as much, the inquiry turns to whether or

2   not irreparable harm is likely in the absence of the granting of an injunction.  That question

3   cannot be evaluated and answered in a vacuum.  Plaintiffs are not advocating that the CVP and

4   SWP stop operating.  Moreover, given the precarious state of the species of concern, <u>some</u> set of

5   protective measures must be implemented.  As detailed above, plaintiffs advocate reversion to the

6   2009 NMFS BiOp RPA applicable to Shasta operations (Action Suite I.2).  Accordingly, from a

7   practical perspective, the court must examine whether or not there will be any practical difference

8   between implementation of the two operational regimes (i.e., Action Suite I.2 from the 2009

9   NMFS BiOp RPA versus the 2020 TMP finalized under the 2019 NMFS BiOp's tiered system)

10  during the pendency of this action; and (2) whether any such difference would materially benefit

11  the species of concern.  Having reviewed the entire present record, the court concludes that

12  PCFFA's motion fails this practical test because the evidence presented to date does not indicate

13  that the requested injunction is likely to materially improve conditions vis-à-vis the current

14  operating regime for the species of concern during the current temperature management period.

15       At the outset, PCFFA argues that reversion to Action Suite I.2 from the 2009 NMFS BiOp

16  would require Reclamation to utilize "more conservative modeling."  (Doc. No. 185 at 4.)  It is

17  not entirely clear what modeling requirements PCFFA is referring to in this regard.  Action Suite

18  I.2 required Reclamation to use a 90% exceedance hydrology[13] in its temperature management

19  planning.  (Doc. No. 85-15 at 602.)  However, the 2020 TMP also used 90% exceedance

20  hydrology in its forecasting.  (Doc. No. 182-2 at 2–3.)  To the extent PCFFA is suggesting that

21  Reclamation should be required to use similarly conservative meteorological (e.g., temperature)

22  inputs to its modeling, PCFFA looks not to Action Suite I.2 for that requirement but to NMFS's

23  /////

24  /////

25  /////

26  /////

27  _____

28  [13]  In a "90 percent exceedance forecast, there is a 10 percent chance that hydrology will be drier
    . . . than assumed in the forecast."  (White Decl. ¶ 10.)

1   2017 draft (i.e., proposed) amendment to Action Suite I.2 that was never formally adopted.  (*See*

2   Doc. No. 153 at 13 n.1 (citing 2017 draft RPA amendment).)[14]

3   　　　PCFFA makes the facially straightforward argument that the proposed injunction would

4   provide greater protection for winter-run and spring-run this year because the terms of the 2009

5   NMFS BiOp RPA would require Reclamation to manage Shasta operations to maintain 56°F at

6   Balls Ferry throughout the temperature management season, whereas the 2020 TMP "results in

7   significantly hotter – indeed lethal – water temperatures in September and October."  (Doc. No.

8   185 at 7.)  First, however, in advancing this argument PCFFA fails to acknowledge significant

9   caveats built into the 2009 NMFS BiOp.  As mentioned, Action Suite I.2 of the 2009 NMFS

10   BiOp RPA generally required Reclamation to achieve daily average water temperatures not in

11   excess of 56°F between Balls Ferry and Bend Bridge from May 15 through September 30 for the

12   protection of winter-run, but indicated that temperatures should not exceed 56°F between Balls

13   Ferry and Bend Bridge from October 1 through October 31 for the protection of spring-run in the

14   mainstem Sacramento River "*whenever possible*."  (2009 NMFS BiOp at 601 (emphasis added).)

15   Accordingly, even if Action Suite I.2 was in force this year, it would not mandate maintenance of

16   56°F between Balls Ferry and Bend Bridge in October.

17   　　　The reality on the ground further narrows this dispute.  The final 2020 TMP promulgated

18   under the 2019 NMFS BiOp does indeed anticipate that 56°F will be maintained at Balls Ferry

19   through mid-September.  (Doc. 182-2 at 8–9 (Table 2).)  As such, the Federal Defendants

20   accurately characterize the central dispute here as centering around the water temperatures

21   targeted for the last two weeks of September.  During those two weeks, the final 2020 TMP

22   indicates that temperatures will be maintained at 56°F at Clear Creek.  Given that all of the

23   modeling runs consistently show temperatures two degrees higher at Balls Ferry than at Clear

24   Creek during the relevant timeframes, it appears reasonable to assume that when water

25

26   [14] Moreover, the planning horizon set up in Action Suite I.2 called for a draft temperature
    management plan to be submitted by Reclamation to NMFS by April 15, with the final plan due
27   May 15.  (2009 NMFS BiOp at 602.)  That time horizon has obviously now passed and it is
    unclear how revised modeling approaches could be incorporated into Reclamations planning at
28   this late stage of the year.

1    temperature is maintained at 56°F at Clear Creek, temperatures will be higher at Balls Ferry,

2    which is fifteen miles downstream of Clear Creek.

3          Setting aside for the moment the question of whether it is possible for Reclamation to

4    maintain 56°F at Balls Ferry through the end of September (let alone the end of October), the

5    record currently before the court does not clearly demonstrate that winter-run would be better off

6    if Reclamation was required to do so.  Plaintiffs maintain, generally, that 56°F is lethal to

7    Chinook salmon eggs.  (*See* Doc. No. 185 at 7.)  There appears to be significant scientific dispute

8    over the exact relationship between temperatures over 56°F and egg mortality.  For example,

9    Defendant Intervenors' expert, Mr. Cavallo, opines that egg mortality at temperatures over 56°F

10   depends on the magnitude and duration of that exposure.  (Doc. No. 189-1, Declaration of

11   Bradley Cavallo (Cavallo Decl.) at 2.)  Yet, the 2019 NMFS BiOp itself acknowledges "lethal

12   and sublethal effects" to eggs at temperatures at or even below 56°F.  (*See, e.g*., 2019 NFMS

13   BiOp at 238 ("Martin et al. (2017), suggests that in natural redds where dissolved oxygen (DO) is

14   variable, the target temperature of 56°F may be too high in some cases since salmon egg mortality can

15   occur at lower temperatures in hypoxia.").)  Regardless, central to the 2019 NMFS BiOp's tiered

16   temperature management regime is the theory that cold water can be more effectively and

17   efficiently used by targeting that water to locations and times of the year when winter-run eggs

18   need to be protected.  In other words, the primary goal of the tiered temperature management

19   regime is to control temperatures at locations and times when winter-run eggs are the most

20   vulnerable.  The 2019 NMFS BiOp and the 2020 TMP attempt to game out the effectiveness of

21   this strategy by using models to forecast temperature dependent mortality based upon information

22   about where and when winter-run redds *are actually deposited/positioned during incubation*.

23   (*See* Cavallo Decl. at ¶ 21 (indicating that modeling used in the 2020 TMP assumed an average

24   spatial and temporal distribution of redds); 2019 NMFS BiOp at 276 (reviewing estimated

25   temperature dependent mortality results for each temperature management tier).)  As mentioned

26   above, applying such modeling techniques, the 2020 TMP anticipates 28% temperature dependent

27   /////

28   /////

1    mortality according to the "Martin" model and 15% according to the "Anderson" model.  (Doc.

2    182-2 at 3.)[15]

3         This is where the rubber meets the road when it comes to the practical inquiry the court

4    faces:  comparing the anticipated impacts to winter-run of the present operating regime against

5    those that likely would occur under PCFFA's proposed injunction.  As the court recognized in its

6    May 18, 2020 Order, some temperature dependent mortality has occurred historically during dry

7    years such as this one.  (Doc. No. 179 at 16 (citing data from Reclamation's BA)[16].)  PCFFA does

8    not appear to dispute this, but instead attempts to demonstrate that applying the 2009 NMFS

9    BiOp would result in reduced temperature dependent mortality of winter-run as compared to the

10   2019 NMFS BiOp's tiered management scheme.

11        PCFFA points to 2009 and 2013 as examples of dry year scenarios when, they contend,

12   temperature dependent mortality was kept relatively lower than the anticipated temperature

13   dependent mortality for this year.  (*See* Doc. No. 185 at 7 ("the 28% temperature dependent

14   mortality of winter-run Chinook salmon estimated to occur this year is significantly higher than

15   the temperature dependent mortality that was observed in *all dry years* under the 2009 NFMS

16   BiOp").)  First, PCFFA argues that in 2009, Reclamation was "required to meet the water

17   temperature requirements of RPA Action Suite I.2 by, if necessary, reducing discretionary

18   allocations for water service contractors." (*Id.* at 4.)  As plaintiffs point out, 2009 was a dry year

19   that followed a critically dry year in 2008, meaning that Reclamation had even less water in

20   storage at the end of April 2009 (3.0 million acre feet) (Doc. No. 85-8 at 39) than it did at the end

21   of April 2020 (3.2 million acre feet)) (Doc. No. 185-16 (PCFFA Ex. AW) at 2).  Yet, according to

22   figures cited by PCFFA—taken from NMFS's 2017 draft RPA amendment—temperature

23   dependent mortality in 2009 was 18.8% (Doc. No. 85-8 at 39), which is lower than the 28%

24   mortality predicted by the Martin model for the 2020 TMP.

25   ――――――――――――――

26   [15]  PCFFA does not appear to take issue with the modeling approaches utilized to produce these
     estimates and in fact repeatedly relies on those figures in support of its motion.

27   [16]  The court has read and considered plaintiffs critique of the temperature dependent mortality
     modeling in the BA.  (*See* Doc. No. 185 at 8 n. 11.)  The court does not rely on the figures in the
28   BA here and therefore does not find it necessary to engage fully in plaintiffs' critique at this time.

22

1        But, as Federal Defendants and Defendant Intervenors point out, this comparison is

2    materially flawed in several respects.  First, the 2009 NMFS BiOp was not signed until June 2009

3    (Doc. No. 85-18 at 2), which was after Reclamation announced water allocations for that year.

4    According to NMFS's Senior Policy Advisor Howard Brown, the 2009 NMFS Biop did not have

5    any practical influence on water temperature management planning or allocations in 2009.  (Doc.

6    No. 188-3, Second Declaration of Howard Brown (2d Brown Decl.) at ¶ 26.)  Even if operations

7    that year had been controlled by the 2009 NMFS BiOp, the 18.8% temperature dependent

8    mortality figure PCFFA cites for 2009 is not comparable to the 28% figure estimated for 2020.

9    This is because the 18.8% figure was produced using a "hindcast" model, while the 28% figure is

10   a "forecast," two modeling approaches that use materially distinct inputs from one another.

11   Among other things, the temperature dependent model forecast used in connection with the 2020

12   TMP used the "90% exceedance hydrology," while the modeled hindcasts (such as the hindcast

13   that produced the 18.8% figure for 2009) used actual hydrology.  (*Id.* at ¶ 21.)  This means that

14   the forecast is a "conservative prediction[]" of temperature dependent mortality that "may prove

15   higher than actual [temperature dependent mortality], especially in dryer water year types where

16   real-time operations and [agency] coordination increase operational flexibility to improve

17   conditions."  (*Id.*)  In contrast, "the hindcast model runs are a closer approximation of actual

18   [temperature dependent mortality] because they use the actual hydrology and meteorology

19   experienced during the temperature management season."  (*Id.*).

20       Defendant Intervenor's expert, Bradley Cavallo, points out another reason why the

21   hindcast temperature dependent mortality figures from the 2017 draft RPA amendment relied

22   upon by PCFFA are distinct from the 2020 temperature management plan's forecasted

23   temperature dependent mortality.  The hindcast figures applied models that used <u>actual</u> egg/redd

24   locations and temporal distributions gathered from field observations, while the forecast figures

25   used inputs that represent average spatial and temporal distribution of redds.  (Doc. No. 189-1,

26   Declaration of Bradley Cavallo (Cavallo Decl.) at ¶ 21.)  As a result, according to Cavallo,

27   comparing the hindcast to the forecast results is an "apples to oranges" comparison.  (*Id.* at 22.)

28   In his declaration, Cavallo suggests that if the modeling approach used to produce the 28%

1    temperature dependent mortality estimate anticipated for 2020 were applied to 2009 conditions,

2    the temperature dependent mortality forecast for 2009 would have *exceeded* 28%.  (*See id.* at ¶ 21

3    & Figure 6).

4        Similar, if not more significant, problems pervade PCFFA's comparison between 2020

5    and 2013.  PCFFA points out that that in 2013, another dry year, North of Delta and South of

6    Delta agricultural allocations were reduced to 75% and 20% respectively.  (Doc. Nos. 185-3

7    (PCFFA Ex. AJ), 185-8 (PCFFA Ex. AO), 185-9 (PCFFA Ex. AP).)  Again citing the 2017 draft

8    RPA Amendment's *hindcast* figures, PCFFA notes that temperature dependent mortality was

9    limited to 9.6% that year.  (Doc. No. 85-8 at 39.)  As with 2009, this comparison suffers from the

10   "apples to oranges" flaw.  Mr. Cavallo's declaration suggests that if the method used to create the

11   2020 TDM forecast were applied to 2013 data, the forecasted temperature dependent mortality

12   would be approximately 25%.  (2d Cavallo Decl. ¶ 22 (Figure 6).)[17]  Moreover, as Federal

13   Defendants point out, the hydrologic situation in 2013 more closely resembled a Tier 2 year, with

14   a greater volume of cold water available for temperature management.  (2d Brown Decl. at ¶ 19.)

15   In sum, the present record with respect to the temperature dependent mortality figures does not

16   support a finding that imposition of the 2009 NMFS BiOp's Action Suite I.2 would result in a

17   material benefit to the winter-run this year.

18       Several other issues merit some discussion.  A central thread underlying PCFFA's motion

19   is that better temperature management results might be possible if Reclamation reduced

20   discretionary deliveries to CVP water users.  PCFFA suggests that imposing Action Suite I.2

21   would either mandate that Reclamation reduce discretionary deliveries to achieve better results, or

22

---

[17]  The court recognizes that it would not be reasonable to expect PCFFA to be able to point to a
perfectly analogous prior year, given the number of variables that could distinguish one year from
another.  Yet, it is powerful to see the modeling exercise presented in Mr. Cavallo's declaration,
in which he takes the modeling approach used by Reclamation in the 2020 TMP to forecast
temperature dependent mortality—the results of which PCFFA cites as part of its critique of the
2020 TMP's anticipated impact to winter-run—and applies that approach to 2009 and 2013.  (2d
Cavallo Decl. ¶ 22 (Figure 6).)  As mentioned, if that particular forecasting approach had been
used in 2009, the forecasted temperature dependent mortality that year would have been
somewhere on the order of 35–40% (higher than the forecast for 2020), while the forecasted
temperature dependent mortality for 2013 would have been somewhere on the order of 25% (only
slightly lower than the forecast for 2020).

1   at least would make such a scenario more likely.  PCFFA invokes 2018 as an example of a year in

2   which the temperature management planning process set forth in Action Suite I.2 produced such

3   beneficial results.  At first, 2018 appeared to be a dry water year type.  In response to

4   Reclamation's initial temperature management plan, in a February 16, 2018 letter, NMFS refused

5   to concur with Reclamation's initial allocations to certain water users, suggesting that NMFS at

6   least thought Reclamation could make further adjustments to improve the temperature

7   management situation for that year.  (Doc. No. 153-6 at 4–5.)  Shortly thereafter, on February 20,

8   2018, in an action that arguably appears to be related to NMFS's expressed concerns,

9   Reclamation backed away from its initial 50% allocation to North-of-Delta agricultural

10  contractors (Doc. No. 185-3 (PCFFA Ex. AJ) at 2) and instead indicated it would "not be

11  providing an initial allocation of water to North-of-Delta Contractors at [that] time, in part

12  because of uncertainty in the ability to manage Shasta Reservoir in a way that will provide

13  adequate temperatures for the protection of endangered salmon species in the Sacramento River

14  throughout the summer and fall in 2018." (Doc. No. 185-12 (PCFFA Ex. AS) at 4.)  However, it

15  is undisputed that hydrologic conditions improved later in 2018, allowing Reclamation to again

16  increase allocations.  (Doc. No. 185-13 (PCFFA Ex. AT); 2d Brown Decl. at ¶ 19 (indicating

17  2018 ended as an "Above Normal" year).)  It remains unclear to the court how the events in 2018

18  bear upon the present circumstances.  While the record does reflect that temperature dependent

19  mortality of winter run may have been entirely avoided in 2018,[18] there is no indication

20  whatsoever that this had anything to do with Reclamation's early-season (February 2018)

21  /////

22  /////

23  /////

24  /////

25

26  [18]  It is somewhat noteworthy that Reclamation produced a "forecast" on May 18, 2018 that
    estimated temperature dependent mortality would be 24.5–24.9% that year depending on the

27  model used.  (*See* 2d Brown Decl., Ex 1 at 141.)  Yet, the hindcast TDM estimate calculated by
    NMFS for purposes of the pending motion suggests 0% temperature mortality actually occurred

28  that year.  (2d Brown Decl. ¶ 19 (Table 1).)

25

allocation decisions, particularly given that allocations were eventually increased due to late season storms.[19]

PCFFA also offers a rough calculation of the volume of water that might be considered "discretionary" this year. These rough calculations are based upon how much water Reclamation has "allocated" to various classes of water users this year and whether Reclamation's contracts with those users contain language permitting Reclamation to reduce allocations to meet legal obligations, such as obligations under the ESA. (*See* Doc. No. 185 at 7–10.) According to PCFFA's calculations, "discretionary" allocations to "North-of-Delta"[20] and "South-of-Delta" agricultural users total more than 600,000 acre feet[21] of water. (*Id*.) This is an impressive volume of water. It would seem logical to assume, as PCFFA indeed does, that if Reclamation could (and chose to) avoid delivering that water to users during the temperature management

---

[19]  To the extent PCFFA is suggesting that if the 2009 NMFS BiOp controlled, NMFS would be empowered to intervene and could *require* Reclamation to reduce allocations and/or take other actions to improve/expand temperature management options, it is not clear that there is any real distinction between the 2009 and 2019 NMFS BiOps in terms of NMFS's power. The court can identify nothing in the 2009 NMFS BiOp that gave NMFS a veto power over water allocations. Moreover, in practice, at least this year, NMFS and Reclamation appear to have engaged in close consultation since early 2020 on the development of the 2020 TMP. (2d Brown Decl. ¶¶ 8–17.) According to NMFS's declarant, this resulted in "significant improvement" to the temperature management situation. (*See id*. at ¶ 16.) Therefore, even assuming a material distinction exists in terms of NMFS's power between the 2009 NMFS BiOp and the 2019 NMFS BiOp, nothing before the court suggests that NMFS would actually have asserted that power to any different effect this year.

[20]  Reclamation suggests that Section 4005 of the Water Infrastructure Improvements for the Nation Act (WIIN Act), Pub. L. No. 114-322, 130 Stat. 1628, 1855 (2016), constrains Reclamation's ability to reduce North of Delta agricultural water allocations. (*See* Doc. No. 183-1 (Third Declaration of Kristin White), at ¶ 18(p).) PCFFA disputes this assertion. (Doc. 185 at 10.) The court finds it is not necessary to resolve this dispute at this time because, even assuming PCFFA is correct, it has not met its burden of justifying the granting of the requested injunctive relief.

[21]  PCFFA's brief also lists an additional 286,656 acre feet of water as "discretionary" based upon the assumption, included in Reclamation's early allocation forecasts, that this year's hydrology would trigger certain shortage provisions in contracts that apply to the delivery of water to "South-of-Delta" wildlife refuges. As the Fourth Declaration of Kristin White makes clear, the hydrologic situation has shifted in recent weeks such that the relevant shortage provisions no longer apply, rendering delivery of this volume of water mandatory. (*See* Doc. No. 188-1 (Fourth Declaration of Kristin White (4th White Decl.)) at ¶ 9.)

1  season and instead retained that water behind Shasta Dam, the temperature management situation

2  could be improved and, relatedly, temperature dependent mortality avoided.  However, the

3  Federal Defendants and Defendant Intervenors offer *numerous* reasons why it is not that simple.

4        First, the deliveries PCFFA label as discretionary do not necessarily originate from behind

5  Shasta Dam.  For example, deliveries to South-of-Delta agricultural water service contractors are

6  made by exporting available water in the delta, "partly made available by releases from Trinity,

7  Shasta, Folsom, New Melones, and tributaries throughout the basin."  (4th White Decl. at ¶ 11.)

8  In fact, recent increased allocations for South-of-Delta agricultural and municipal contractors

9  were due to projected increased releases from Folsom Dam during the summer based upon

10  improved hydrology on the American River.  (*Id*.)  Moreover, as of June 7, 2020, Reclamation

11  had approximately 381,000 acre feet of water stored in the federal portion of San Luis Reservoir,

12  which is located south of the delta.  (Doc. No. 189-3 (Declaration of Lee Bergfeld) at ¶ 12.)  That

13  water is available to meet the water supply needs of South-of-Delta water service contractors and

14  represents a volume of water that cannot be moved back into Shasta Lake.  (*Id*.).  In addition, the

15  nearly all diversions by agricultural water users are made downstream of both Clear Creek and

16  Balls Ferry.  As a result, water that is released from Shasta Dam *for temperature management*

17  may be available for diversion after it has met its temperature management purposes.  (*Id*. at ¶

18  21.)  Finally, simply leaving a certain volume of water in Shasta Lake "does not translate directly

19  into an equivalent amount of cold water in storage available for temperature management."  (Doc.

20  No. 189-2 (Declaration of Michael Deas (Deas Decl.)) at ¶ 9.)  Rather, numerous factors would

21  need to be assessed to determine how additional stored water could be utilized to achieve

22  temperature targets in the Sacramento River.  (*Id*.)  Indeed, this is one reason why Reclamation

23  runs numerous simulations in connection with developing a temperature management plan.  (*Id*.)

24  In sum, it is not enough to simply point to a volume of water that is "discretionary," because it is

25  speculative to assume that withholding those deliveries would result in any particular volume of

26  water being retained behind Shasta Dam nor that retaining that additional volume of water would

27  materially improve temperature management options.

28  /////

This conclusion also precludes any finding that the granting of the requested injunction is independently warranted to protect spring run.  PCFFA suggests that imposition of Action Suite I.2 would benefit spring-run because it would require Reclamation to sustain colder temperatures later into September (and possibly into October).  (*See* Doc. No. 185 at 6.)  In theory, better temperature conditions could benefit eggs deposited by those spring-run that spawn in the mainstem Sacramento River below Keswick Dam.[22]  As the court mentioned in its May 18, 2020 order, "the record suggests there are real-world tradeoffs involved in temperature management," particularly in regard to temperature management toward the end of the summer and early fall. (Doc. 179 at 16.)  There, the court explained that, "generally, under the tiered approach, keeping water temperatures low in the summer may mean that water temperatures are higher than they might otherwise be in September and October, with resulting risk (and likely egg mortality) for later-spawning winter run and those spring-run that spawn in the mainstem Sacramento River." (*Id.*)  However, as the court noted, the evidence cited by PCFFA's expert, Dr. Rosenfield suggests that *in a dry year*, temperatures under the tiered approach would actually be *lower* on average through October under the 2019 NMFS BiOp than they would have been under the 2009 NMFS BiOp.  (*Id.*)  The present record before the court appears to bear this out.  Defendant Intervenors' declarant indicates that if the 2009 BiOp's Action I.2 were in place this year (i.e., if Reclamation was required to ensure 56°F or colder temperatures at Balls Ferry from September 21 through September 30), this would either require warmer temperatures in October than currently projected, or warmer temperatures earlier in the summer, or both.  (*See* Deas Decl. at ¶¶ 10–12.) Therefore, given the absence of evidence showing temperature management options can be expanded, the court cannot find on the present record that PCFFA's requested injunction would improve conditions for any spring run eggs deposited in the mainstem Sacramento.  Rather, the requested injunction could potentially have detrimental impacts on later-spawning winter-run.

---

[22]  For purposes of this analysis, the court assumes without deciding that the population of spring-run likely to spawn in the Upper Sacramento River are important to the spring-run population overall.  The court acknowledges that this is disputed.  (*See* Cavallo Decl. at ¶¶ 27–39 (opining that the population of spring run likely to spawn in the mainstem Sacramento River cannot appreciably contribute to viability or recovery of that population in part because their numbers are small and the population is not sufficiently segregated from more abundant fall run Chinook).)

1   (*See* Cavallo Decl. ¶ 26 (indicating that requiring Reclamation to maintain 56°F at Balls Ferry

2   through October would potentially have adverse impacts on winter run because it could exhaust

3   the cold water pool before winter run incubation is complete or delay onset of cold water

4   management)).

5          The court has also carefully read and considered the correspondence between California's

6   State Water Resources Control Board (Water Board) and Reclamation regarding the 2020 TMP.

7   (*See* Doc. No. 185-25 (PCFFA Ex. BF).)  In a June 1, 2020 letter, citing its authority under Water

8   Board Order 90-5,[23] the Water Board requested that Reclamation "provide information on

9   operational scenarios other than those proposed in [the 2020] TMP."  (*Id*. at 2.)  Among other

10  things, the Water Board requested that Reclamation model a scenario in which exports for service

11  contractors are reduced to provide 100,000 acre feet of additional storage in Shasta Reservoir as

12  well as a similar scenario where up to 250,000 acre feet of added storage are provided "if

13  feasible."  (*Id*. at 9.)  Reclamation committed itself to producing that information to the Water

14  Board by June 22, 2020, (4th White Decl. at ¶ 19), and did so, producing a copy to the court

15  pursuant to the court's recent request.  (*See* Doc. Nos. 197, 200.)[24]

16         According to Reclamation's response to the Water Board, Reclamation is actively

17  working within the "Sacramento River Temperature Task Group" (SRTTG)[25] to review potential

18  updates to the 2020 TMP to reflect the most up-to-date hydrologic information, which has

19  _____

20  [23]  According to the June 1, 2020 letter, State Water Board Order 90-5 requires Reclamation to
    take actions "reasonably within its control to protect winter-run Chinook salmon and other native

21  species from elevated temperatures and other adverse conditions created by Reclamation's
    operations on the Sacramento River."  (*Id*. at 2.)

22

23  [24]  Reclamation did not model a scenario in which exports for service contractors are reduced to
    provide 250,000 acre feet of additional storage in Shasta Reservoir or at least no such model

24  appears in Reclamation's response to the Water Board that was filed with the court.

25  [25]  The record before the court does not appear to define the SRTTG in great detail.  The 2009
    NMFS BiOp describes it as one of several "Fisheries and Operations Technical Teams whose

26  function is to make recommendations for adjusting operations to meet contractual obligations for
    water delivery and minimize adverse effects on listed anadromous fish species."  (2009 NMFS BiOp

27  at 581.)  The 2019 NMFS BiOp requires Reclamation, through the SRTTG, to consider technical
    assistance from NMFS regarding the development of annual temperature management plans.  (2009

28  NMFS BiOp at 815.)

1    improved somewhat since May of this year.  (Doc. No. 200-1 at 2–3.)  Those efforts are ongoing

2    and appear to be bearing some fruit in the form of three possible scenarios (SRTTG Scenarios)

3    that could be implemented *without reducing deliveries* while also lowering temperature

4    dependent mortality to some extent.  (*Id*. at 2; *see also* Doc. No. 200-5 at 1–2.)  In response to the

5    Water Board's June 1 request, Reclamation also performed preliminary modeling for a scenario

6    that would reduce releases from Keswick Dam by 100,000 acre feet in July of this year[26] ("July

7    Reduced Releases Scenario").  (Doc. No. 200-1 at 3–4.)

8         Reclamation modeled how the three SRTTG Scenarios and the July Reduced Releases

9    Scenario could impact temperatures and temperature dependent mortality.  (*See* Doc. Nos. 200-4;

10   200-5 at 1–2.)  Reclamation indicates that the modeling results show similar summer

11   temperatures across all four modeling scenarios.  (Doc. 200-1 at 3–4.)  Indeed, Reclamation has

12   indicated that the modeling for the July Reduced Releases Scenario actually "shows minor

13   warming between Clear Creek and Balls Ferry on a monthly average."  (*Id*. at 4.)  The exhibits

14   attached to Reclamation's June 22, 2020 response appear to support these conclusions.  (*See* Doc.

15   No. 200-3.)  Perhaps most important is the information Reclamation provides about likely

16   temperature dependent mortality.  The following table provided by Reclamation to the Water

17   Board presents the results under both the Anderson and Martin models for operations as planned

18   under the current 2020 TMP, as well as for the three SRTTG Scenarios and the July Reduced

19   Releases Scenario that Reclamation modeled at the Water Board's request.

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

27   _____

28   [26]  According to Reclamation, "the primary opportunity to reduce releases and increase Shasta
     Reservoir storage is the month of July."  (Doc. No. 200-1 at 4.)

| Scenario | Stage Dependent Egg Mortality (%) [Anderson Model] | Stage Independent Egg Mortality (%) [Martin Model] |
|---|---|---|
| Scenario 148 – Temperature Management Plan (SRTTG May 26) [2020 TMP] | 12.2 | 21.7 |
| Scenario 148 – Delay Side Gate Use | 11.6 | 26.2 |
| Scenario 148 – Extend 53.5°F in August | 5.9 | 19.3 |
| Scenario 148 – Extend 54°F in September | 10.4 | 15.8 |
| Reduce Keswick Release by 100 TAF in July | 15.8 | 16.1 |

(Doc. No. 200-5 at 1–2.)

First, the court notes that the updated temperature dependent mortality figures for the 2020 TMP (without any operational modifications in light of new hydrology) provided in the first row of the table are slightly improved over the original figures provided upon finalization of that plan as of May 20, 2020.[27]  Moreover, at least two of the operational scenarios presently being considered by the SRTTG lower projected temperature related mortality even further under *both* models, while the third only lowers projected temperature related mortality under one of the models.  Returning then to what plaintiff PCFFA has requested in moving for a preliminary injunction, namely reduced deliveries, it is far from obvious based upon the information provided in the above table that the July Reduced Releases Scenario represents a material improvement over any other scenario under consideration.[28]  Those models suggest that there may be very little difference in  the results likely to be achieved in terms of water temperature management between the 2020 TMP and a plan under which exports for service contractors are reduced so as to provide 100,000 acre feet of additional storage in Shasta Reservoir.  Moreover, it appears that at least two operational scenarios under consideration may be likely to produce more favorable results in that

---

[27]  At that time, as discussed above, the Anderson model indicated 15% mortality, while the Martin model indicated 28% mortality.

[28]  According court's own somewhat crude calculation, the average of the two modeling approaches for each Scenario are 16.95% (2020 TMP using June 12, 2020 data), 18.9% (Delay Side Gate Use Scenario), 12.6% (Extend 53.5°F in August), 13.1% (Extend 54°F in September, and 15.95% (Reduce Keswick Release by 100 TAF in July).

1  regard than either of the first two.  In short, the court does not believe that Reclamation's

2  response to the Water Board, nor any of the scenarios disclosed in that response, provides support

3  for the granting of the requested injunctive relief at this time.

4          The court cautions the parties against misinterpreting the court's findings in this regard.

5  This should not in any way be read as a finding that reduced deliveries should not be considered

6  or that they could not make a material difference in temperature management.  Rather, there is

7  simply an absence of proof with respect to this issue in the present record before the court.  This

8  is particularly problematic in the present context.  As the court observed in its May 18, 2020

9  order, it approaches the management issues presented here with great caution:

10                 This is an incredibly complex regulatory arena.  As discussed
11         above, two federal agencies with extensive and long-running
           expertise—NMFS (in fisheries) and Reclamation (in Water Project
12         operations)—have struggled for many years to identify and develop
           a regulatory regime that is both sufficiently protective of the
13         impacted species and legally and practically feasible.  In prior years
           of extended drought, these efforts resulted in what all parties appear
14         to characterize as a disaster:  the near extirpation of two brood years
           (2014 and 2015) of the critically endangered winter-run.  These
15         losses occurred at least in part because Reclamation "lost control"
           of temperatures in the Upper Sacramento River.  From 2016
16         through 2019, NMFS and Reclamation (along with others) have
           both battled and cooperated over the appropriate way forward.  The
17         result of this back-and-forth is before the court in the form of the
           2019 NMFS BiOp, which, at least facially, appears to have
18         attempted to address the failures of the past by adjusting the
           mandated approach to temperature management so as to account for
19         where the fish in need of protection are actually located in any
           given year and by conserving cold water for the most critical times
20         for incubating eggs, while also attempting, where possible, to
           provide suitable spawning conditions for those spring-run that
21         spawn in the Upper Sacramento.

22  (Doc. No. 179 at 15.)  In light of the absence of evidence that the granting of the requested

23  injunction would benefit either of the species of concern this year, the court will not take the

24  extraordinary step of interfering in this complex regulatory regime.

25  /////

26  /////

27  /////

28  /////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons set forth above, the remaining aspects of PCFFA's motion for preliminary injunction (Doc. No. 81) involving Upper Sacramento temperature management issues are DENIED.

IT IS SO ORDERED.

Dated:   **June 24, 2020**

_____
UNITED STATES DISTRICT JUDGE