HAMILTON CANDEE (Cal. SBN 111376)
BARBARA JANE CHISHOLM (Cal. SBN 224656)
NICOLE COLLINS (Cal. SBN 338506)
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: hcandee@altber.com; bchisholm@altber.com;
          ncollins@altber.com

*Attorneys for Plaintiffs Golden State Salmon Association, Natural Resources
Defense Council, Inc., Defenders of Wildlife, and Bay.Org d/b/a The Bay Institute*

GLEN H. SPAIN (Cal. SBN 88097)
P.O. Box 11170
Eugene, OR 97440-3370
Telephone: (541) 689-2000
Email: fish1ifr@aol.com

*Attorney for Plaintiffs Pacific Coast Federation of Fishermen's Associations and
Institute for Fisheries Resources*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GINA RAIMONDO, in her official capacity as Secretary of Commerce, *et al.*,<br><br>Defendants. | Case No. 1:20-cv-00431-DAD-EPG<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION FOR 2022**<br><br>Hearing date: February 11, 2022<br>Judge: Hon. Dale A. Drozd<br><br>Courtroom 5, 7th Floor<br>2500 Tulare Street<br>Fresno, California 93721 |

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I. Federal Defendants and Intervenors Misstate the Standard for an ESA
Injunction ................................................................................................................. 2

II. Plaintiffs Have Met Their Burden of Showing the Proposed Injunctive
Relief Is Necessary to Avoid Irreparable Harm if 2022 Is Dry or Critically
Dry ........................................................................................................................... 3

    A. Plaintiffs' Proposed Injunction Regarding Shasta Dam Operations Is
    Necessary to Avoid Irreparable Harm ........................................................ 3

    B. Violating Delta Water Quality Objectives Would Cause Irreparable
    Harm Absent Plaintiffs' Proposed Injunction ........................................... 7

    C. Plaintiffs' Proposed Modifications to Delta Operations Are
    Necessary to Avoid Irreparable Harm ....................................................... 9

        1. Additional restrictions on OMR flows are critical to
        species' survival and recovery ............................................... 9

        2. Reinstating the I:E ratio is necessary to avoid irreparable
        harm ....................................................................................... 10

    D. Plaintiffs' Proposed Injunction Is Designed to Avoid Irreparable
    Harm While Also Being Feasible ............................................................. 11

    E. Vacating the Incidental Take Statement in Part Is Necessary and
    Appropriate to Comply with the ESA ...................................................... 15

III. The Equities and Public Interest Strongly Weigh in Favor of Plaintiffs'
Injunction ............................................................................................................... 16

IV. Plaintiffs Are Likely to Succeed on the Merits of Their ESA and APA
Claims .................................................................................................................... 18

CONCLUSION ................................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Rivers v. Nat'l Marine Fisheries Serv.*,
126 F.3d 1118 (9th Cir. 1997).................................................................................. 16

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
140 S. Ct. 1891 (2020) ........................................................................................... 18

*Earth Island Inst. v. Carlton*, 626 F.3d 462 (9th Cir. 2010) ....................................... 17

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,
109 F. Supp. 3d 1238 (N.D. Cal. 2015) .................................................................. 15

*Nat. Res. Def. Council v. Bernhardt*,
No. 1:05-cv-01207, WL 937872 (E.D. Cal. Feb. 26, 2019) ........................... 13, 19

*Nat. Res. Def. Council v. Kempthorne*,
506 F. Supp. 2d 322 (E.D. Cal. 2007).................................................................... 10

*Nat. Res. Def. Council v. Kempthorne*,
539 F. Supp. 2d 1155 (E.D. Cal. 2008) .................................................................. 16

*Nat. Res. Def. Council v. Kempthorne*,
No. 1:05-CV-01207 OWW GSA, 2007 WL 4462395 (E.D. Cal. Dec. 14, 2007)................. 15

*Nat'l Wildlife Fed'n v. Nat'l Marine Fish. Serv.*,
422 F.3d 782 (9th Cir. 2005).................................................................................. 17

*Nat'l Wildlife Fed'n v. Nat'l Marine Fish. Serv.*,
524 F.3d 917 (9th Cir. 2008).................................................................................... 3

*Nat'l Wildlife Fed'n v. Nat'l Marine Fish. Serv.*,
886 F.3d 803 (9th Cir. 2018)............................................................................. 2, 16

*Or. Nat. Res. Council v. Allen*,
476 F.3d 1031 (9th Cir. 2007)................................................................................ 16

*Sierra Forest Legacy v. Rey*,
577 F.3d 1015 (9th Cir. 2009)............................................................................ 3, 16

*Sierra Forest Legacy v. Sherman*,
646 F.3d 1161 (9th Cir. 2011).................................................................................. 3

*United States v. Glenn-Colusa Irr. Dist.*,
788 F. Supp. 1126 (E.D. Cal. 1992)......................................................................... 8

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................. 2

**Federal Statutes**

16 U.S.C. § 1536(a)(2) ........................................................................................... 2, 13

16 U.S.C. § 1538(a)(1)(B) ........................................................................................... 15

16 U.S.C. § 1539(a)(2)(B)(iv) ...................................................................................... 15

Reclamation Act § 8 ...................................................................................................... 8

San Joaquin River Restoration Settlement Act, Pub. L. No. 111-11, 123 Stat. 991
   (2009) ................................................................................................................ 17, 18

**Federal Rules**

Fed. R. Civ. P. 65 ......................................................................................................... 16

**INTRODUCTION**

The 2019 Biological Opinions issued by the National Marine Fisheries Service ("NMFS") and the U.S. Fish and Wildlife Service ("FWS") (collectively, the "2019 BiOps") must be enjoined in 2022 because they authorize operations that jeopardize the survival and recovery in the wild of winter-run and spring-run Chinook salmon, Central Valley steelhead, and Delta Smelt. Federal Defendants and State *Amici* agree that this Court must use its equitable authority to modify the 2019 BiOps. They disagree with Plaintiffs, however, on the extent of protections necessary to prevent devastating impacts to the species in 2022—instead offering their Interim Operations Plan ("IOP"), which lacks adequate mandatory provisions for species protection.

In assessing what injunctive relief is needed in 2022, this Court must evaluate what measures will ensure that the Central Valley Project ("CVP") and State Water Project ("SWP") (collectively, "Water Projects") comply with the Endangered Species Act ("ESA"). Federal Defendants and State *Amici* make no claim that the IOP will avoid ESA violations, arguing only for deference to their compromise proposal—which is certainly not the standard for issuing an injunction. In contrast, Plaintiffs acknowledge and meet the governing standard: Plaintiffs' proposed injunction is biologically justified and narrowly tailored to ensure Water Project operations comply with the ESA, including through terms designed to avoid Shasta operations that would kill most of the 2022 class of winter-run Chinook salmon and Delta operations that would imperil the Delta Smelt's existence and irreparably damage other ESA-listed species. Perhaps recognizing that Plaintiffs' proposed measures actually provide the relief these species need, the primary objection raised by Federal Defendants—joined by intervenor-defendants ("Intervenors")—is that Plaintiffs' proposal is not "feasible." But this misconstrues Plaintiffs' proposed relief, which explicitly permits modification of the measures these parties claim are not feasible. The real objection, it appears, is that Plaintiffs' injunctive relief is real and enforceable— and does not simply defer to future agency processes the hope that the coordinated operations of the Water Projects will not irreparably harm ESA-listed fish species in the Bay-Delta. Only Plaintiffs' proposed injunction is tailored to prevent ESA violations in 2022.

# ARGUMENT

## I.  Federal Defendants and Intervenors Misstate the Standard for an ESA Injunction.

Federal Defendants' and Intervenors' briefing misstates the standards that govern the pending motions.  When the appropriate legal framework is applied, it is clear that only Plaintiffs' proposed relief meets the standard for an injunction necessary to remedy violations of the ESA.

It is black-letter law that plaintiffs are entitled to an injunction where they demonstrate that they are "likely to succeed on the merits," are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Federal Defendants nonetheless insist that the Court need not consider the likelihood of success on the merits, asserting that Federal Defendants' disavowal of the 2019 BiOps renders that inquiry—and even consideration of the currently operative 2019 BiOp terms—irrelevant.  Dkt. 326 at 7.[1]  But Federal Defendants' argument is based on the unfounded notion that the Court can exercise "equitable authority" in a vacuum, without reference to the agencies' obligations under the ESA and without considering whether the relief is tailored to remedy violations of law.[2]  Plaintiffs' opposition to Federal Defendants' request for remand without vacatur addresses this flawed argument in more detail, Dkt. 320 at 19–21, but for purposes of the instant motion, Federal Defendants' argument has a particularly pernicious effect:  It constructs a framework in which Federal Defendants need not establish that Water Project operations are not jeopardizing ESA-listed species; in which the IOP is owed deference as the agencies' best efforts (and compromise with the State); and in which unauthorized take and actions that jeopardize imperiled fish species must be accepted.[3]

---

[1] All page citations refer to the ECF pagination, except for the citations to the 2019 BiOps, which refer to the original page numbers.

[2] Intervenors, in contrast, at least acknowledge that equitable relief must align with agencies' statutory obligations, Dkt. 344 at 20, which include avoiding jeopardy to ESA-listed species.  *See* 16 U.S.C. §1536(a)(2).

[3] As Federal Defendants acknowledge, several of the ESA-listed species are in "critical condition." Dkt. 314 at 24 (quoting Dkt. 314-2 (Conant Decl.) ¶13); Dkt. 314-3 (Brown Decl.) ¶14 (noting two previous years of low survival for winter-run).  Such imminent, severe harms are more than sufficient to satisfy the heightened "mandatory injunction" standard of "extreme or very serious damage" urged by Intervenors.  Dkt. 344 at 12; *see also* Dkt. 325 ("Supp. Rosenfield Decl.") ¶¶51–68.  Moreover, the Ninth Circuit has rejected the argument that only extinction-level harm will justify an ESA injunction, including an interim injunction mandating operations during remand.  *Nat'l Wildlife Fed'n v. Nat'l Marine Fish. Serv.*, 886 F.3d 803, 818–19 (9th Cir. 2018).

Although this Court should consider the IOP as an "option[] . . . on the table" to address severe harms to listed fish species, *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009), the Court owes no deference to Federal Defendants' conclusions regarding irreparable harm or the balance of hardships. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1185–86 (9th Cir. 2011); *see also* Dkt. 173 at 26. Indeed, if the government's experts "were always entitled to deference concerning the equities of an injunction, substantive relief against federal government policies would be nearly unattainable . . . ." 646 F.3d at 1186.

Nor is it the case that, as State *Amici* argue, the Court's analysis should "begin . . . and . . . end" with the IOP. Dkt. 343-1 at 16. Plaintiffs' proposed injunctive relief for 2022 is an option on the table, just as the IOP is, which should be compared to the status quo, *i.e.*, operations under the 2019 BiOps, and evaluated in light of Federal Defendants' statutory obligation to avoid jeopardy. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fish. Serv.*, 524 F.3d 917, 929–31 (9th Cir. 2008) (relevant inquiry is whether status quo will result in jeopardy in absence of requested injunctive relief).[4] Plaintiffs have demonstrated that allowing Water Project operations to continue under the 2019 BiOps will jeopardize ESA-listed fish species, and that their tailored injunction minimizes the chances that operations will jeopardize these species in 2022, by requiring enforceable protective measures that are subject to modification upon proof (not speculation) that they are not attainable.

To aid the Court, Plaintiffs include within the discussion below bullet points identifying (1) the status quo condition, (2) Plaintiffs' proposed terms, and (3) any corresponding IOP terms.

**II. Plaintiffs Have Met Their Burden of Showing the Proposed Injunctive Relief Is Necessary to Avoid Irreparable Harm if 2022 Is Dry or Critically Dry.**

**A. Plaintiffs' Proposed Injunction Regarding Shasta Dam Operations Is Necessary to Avoid Irreparable Harm.**

Plaintiffs have demonstrated that their proposed injunction regarding Shasta Dam operations is necessary to avoid irreparable harm if 2022 is Dry or Critically Dry. Federal

---

[4] Intervenors urge that, in considering injunctive relief, the Court should recognize that ongoing harms to listed species stem from the drought, Dkt. 328 at 18, but the ESA requires that Water Project operations avoid jeopardy in light of drought and other baseline conditions. *Nat'l Wildlife Fed'n*, 524 F.3d at 931.

Defendants wholly fail to rebut the scientific basis of Plaintiffs' proposed measures regarding

water storage levels, water temperatures for salmon eggs, and temperature-dependent mortality.

Dkt. 326 at 19–23.  That is not surprising because Plaintiffs' proposed requirements are consistent

with prior findings by NMFS and other agencies.  *See, e.g.*, Supp. Rosenfield Decl. ¶¶31, 32 &

n.11, 38, 41–42 & fig.1.  Nor do Federal Defendants—or any party—dispute that Shasta

operations, absent an injunction, are likely to cause take of winter-run Chinook salmon that

exceeds the incidental take statement in the 2019 NMFS BiOp if 2022 is Dry or Critically Dry.  *Id*.

¶33; Dkt. 322 at 23–24.  Instead, Federal Defendants' main response to Plaintiffs' proposed

protections for Shasta operations is based on the faulty premise that the protections are not

"feasible"—an argument that misrepresents Plaintiffs' proposed relief, as discussed in Part II.D

below.

In-Stream Temperatures and Temperature-Dependent Mortality

- **2019 NMFS BiOp.**  A "tiered" approach that establishes temperature targets based on the year's tier: in "Tier 1" years, 53.5°F at Clear Creek from May 15 to October 1; in "Tier 2" years, 53.5°F only during an egg incubation period; in "Tier 3" years, temperatures as high as 56°F at Clear Creek are allowed; and there is no maximum water temperature in the driest "Tier 4" years.  NMFS BiOp at 54.  No temperature target for the period when pre-spawning winter-run are present.  No limit on maximum temperature-dependent mortality for winter-run in any given year; authorized take is exceeded if there are two consecutive years of egg to fry survival of less than 15% followed by a third year of less than 21%.  *Id*. at 801–02.

- **Plaintiffs' Proposal.**  Reclamation may not exceed a maximum daily average water temperature of 54.5°F (if 2022 is Critically Dry) or 53.5°F (if 2022 is Dry) at Clear Creek from date that initiation of spawning of winter-run is observed or May 15, whichever is earlier, until October 31, and may not exceed a maximum daily average water temperature of 61°F at Jelly's Ferry from March 1 to the date that initiation of spawning of winter-run is observed or May 15, whichever is earlier.  Maximum temperature-dependent mortality of 30% for winter-run if 2020 is a Critically Dry year.  Reclamation can seek modification of these requirements if, despite curtailment of deliveries to contractors, it is unable to meet them.

- **IOP.**  Reclamation agrees to attempt to meet daily average water temperature targets at Clear Creek from May 15 to October 31 of 55°F (Critically Dry), or 54°F (Dry or Below Normal).  IOP ¶15.  If Reclamation is unable to meet these targets for the entire period, then agencies will agree to operations for the longest period possible.  *Id*. ¶12(i)(b).  No temperature target for pre-spawning winter-run.  No limit on maximum temperature-dependent mortality for winter-run in any given year; adopts 2019 NMFS BiOp's incidental take statement.

Plaintiffs' proposed in-stream temperature requirements for the period following the

initiation of spawning by winter-run Chinook salmon are fully supported by NMFS' own research

and by scientific literature.  Supp. Rosenfield Decl. ¶¶38–41.  Federal Defendants offer no

rebuttal. Tellingly, Federal Defendants never claim that the IOP's higher "targets" are sufficient to avoid jeopardy to the species, instead making conclusory statements about the IOP's procedures and their potential to reduce harm. *See* Dkt. 326-3 (Brown Decl.) ¶23; Dkt. 326 at 21–22.

Intervenors argue that Plaintiffs' proposed in-stream temperature requirements are unnecessary because NMFS' temperature model and thresholds are not credible and it is "too early to know" whether the 2019 NMFS BiOp will be sufficiently protective, such that the Court should wait until the temperature management plan is developed in May. Dkt. 344 at 21, 24. Neither argument has merit. As to the first, Intervenors offer the declaration of Bradley Cavallo, who claims that in-stream temperatures can exceed 57°F without causing temperature-dependent mortality, completely rejecting the Martin model. Dkt. 333 ¶¶17, 79–81. This contradicts the peer-reviewed research. *See* Supp. Rosenfield Decl. ¶32 & n.11 (citing Martin et al. 2016, Myrick and Cech 2004). Intervenors' disavowal of the Martin model, Dkt. 344 at 21, also contradicts Intervenors' position that the Court should uphold the 2019 NMFS BiOp, Dkt. 344 at 30–34, given that the BiOp explicitly relies on the Martin model, including in calculating temperature-dependent mortality for purposes of the incidental take statement. NMFS BiOp at 801. Intervenors' second argument, regarding the timing of relief, ignores that allocations made early in the season can significantly impact Reclamation's ability to manage in-stream water temperatures throughout the management season: Reclamation makes initial allocations in February and on average delivers more than 300,000 acre-feet of water to contractors in May. *Id.* at 218. Allowing Reclamation to wait until May to ensure that it has not over-allocated water would impair its ability to ensure operations avoid causing jeopardy.

Federal Defendants argue that there is no need to guard against pre-spawn mortality of adult winter-run Chinook salmon by setting in-stream temperature requirements for the pre-spawning period. Dkt. 326 at 22–23. Plaintiffs' proposed measure, however, is identical to one proposed by NMFS in July 2019. Supp. Rosenfield Decl. ¶31. And Federal Defendants do not dispute that last year's operations resulted in unauthorized take of winter-run and produced the highest level of pre-spawn mortality of winter-run in decades, nearly twice the prior record level (which occurred in 2020). Dkt. 326-3 ¶28. Plaintiffs have shown a need for this provision.

Federal Defendants make no persuasive argument against including a protective measure that would limit maximum temperature-dependent mortality in 2022. (The 2019 BiOps and IOP include no such limit.) Federal Defendants' only response is that requiring Reclamation to ensure that forecasted temperature-dependent mortality is less than 30% would (implicitly) be overly protective because forecasts "tend to be higher than hindcasts," citing the last two years. Dkt. 326-3 ¶¶21–25; Dkt. 326 at 22–23. But in 2021, the temperature management plan forecast that temperature-dependent mortality would be 64-73%, Dkt. 326-3 ¶24, and the hindcast was slightly *higher* at 75% (not 70%, as erroneously cited by Federal Defendants). Compare Dkt. 326-3 ¶24 with Supp. Chisholm Decl., Exh. P at 4–8 (Jan. 3, 2022 JPI Letter). And with respect to 2020, Reclamation has previously admitted that widespread smoke from wildfires in August and September "likely reduced temperature dependent mortality" from what was forecast; thus, 2020 is not simply a result of "real time operations" producing lower mortality than predicted, as Federal Defendants claim. Dkt. 326-3 ¶25; Supp. Chisholm Decl., Exh. Q at 53–54.

Shasta Storage Requirements

- **2019 BiOps.** No requirements for Shasta Reservoir carryover storage.

- **Plaintiffs' Proposal.** End of April storage requirement of 3.5 MAF in Critically Dry and Dry years; end of September storage requirements of 1.9 MAF (Critically Dry) or 2.2 MAF (Dry). Reclamation can seek modification of these requirements if, despite curtailment of deliveries to contractors, it is unable to meet the storage levels.

- **IOP.** No end of April storage targets. End of September storage targets determined by May 1, 2022, with "potential . . . carryover storage range volumes" of 1.2—1.8 MAF in Critically Dry year; 1.8—2.5 MAF in Dry year; and 2.5—3.2 MAF in Below Normal year. IOP ¶16.

Federal Defendants offer no argument against Plaintiffs' proposed Shasta storage requirements other a feasibility concern: They do not rebut Plaintiffs' showing that storage requirements for end of April and end of September are critical to preventing jeopardy. Nor do Federal Defendants argue that the IOP's storage "targets" will be sufficient to avoid jeopardy.

Intervenors oppose Plaintiffs' storage requirements by challenging the amounts of storage proposed. Dkt. 344 at 22–24. But Plaintiffs' proposed terms are based on prior analyses by Reclamation and NMFS, including an assessment of the volume of water storage necessary to ensure access to the upper gates of the temperature control device, Supp. Rosenfield Decl. ¶37.

**B. Violating Delta Water Quality Objectives Would Cause Irreparable Harm Absent Plaintiffs' Proposed Injunction.**

- **2019 BiOps.** Meeting the Delta inflows, Delta outflow, and Delta Cross Channel gate closures required by D-1641 is part of the proposed action analyzed and authorized in the 2019 BiOps. Waivers through Temporary Urgency Change Petitions ("TUCPs") were not analyzed.

- **Plaintiffs' Proposal.** Reclamation will comply with D-1641 water quality objectives that were analyzed and authorized in the 2019 BiOps, including Delta inflows, Delta ouflows, Delta Cross Channel gate closures. Reclamation can seek modification of this requirement if, despite curtailment of deliveries to contractors, it is unable to meet these objectives.

- **IOP.** Contemplates Reclamation and the California Department of Water Resources ("DWR") seeking waivers of D-1641 and assumes that State Water Resources Control Board ("SWRCB") will use emergency authorities to address dry conditions and "implement[] water curtailments in a timely manner." IOP ¶14.

Plaintiffs have demonstrated that Water Project operations are likely to cause irreparable harm to Delta Smelt and ESA-listed salmonids if operations fail to adhere to Delta water quality objectives as Federal Defendants proposed in their recent TUCP. Dkt. 322 at 28–29; Supp. Rosenfield Decl. ¶¶70–90. Importantly, neither Federal Defendants nor State *Amici* dispute Plaintiffs' evidence that violating these water quality objectives would cause irreparable harm to the species; Federal Defendants' declarant explicitly offers "no opinion" regarding the effects of the proposed TUCP. *See* Dkt. 326-1 (Nobriga Decl.) ¶4. Intervenors likewise offer no evidence to rebut Dr. Rosenfield's conclusions of irreparable harm. Dkt. 344 at 24–26.

Intervenors speculate that this element of Plaintiffs' proposed injunction "may" become moot. *Id.* at 24–25. While it is true that, on January 18, 2022, Reclamation and DWR withdrew the TUCP for February to April, Federal Defendants noted that they may file another TUCP later this year if conditions are dry. Supp. Chisholm Decl., Exh. R. Because the requested relief would only be moot if Federal Defendants had committed to meeting Delta water quality objectives in 2022, and they have not done so, Intervenors' mootness argument must fail.

Federal Defendants, State *Amici*, and Intervenors all make arguments that misconstrue Plaintiffs' proposed injunction and assume that it would somehow intrude on state administrative processes and/or is beyond this Court's authority. Dkt. 326 at 26–28; Dkt. 343-1 at 18–23; Dkt. 344 at 24–26. These arguments are without merit and turn the Supremacy Clause on its head.

As an initial matter, and as Plaintiffs explained in their opening brief, the actions analyzed

and authorized by the 2019 BiOps include compliance with the water quality objectives in D-1641. *See* Dkt. 322 at 28. No party has disputed this.[5] Absent Plaintiffs' proposed injunction, there is a reasonable likelihood that Reclamation will not comply with the water quality objectives of D-1641—the waiver of which the parties do not dispute will irreparably harm ESA-listed species. Moreover, Federal Defendants have a present obligation to implement Water Project operations in compliance with the project authorized by the 2019 BiOps, and to avoid jeopardy. That Reclamation must comply with the terms and conditions imposed on their water rights under state law does not change this obligation; Federal Defendants acknowledge that they must comply with the terms of their water rights "as long as they are not preempted by federal law." Dkt. 326 at 26. Any decision by the SWRCB that the requirements of D-1641 may be waived pursuant to a TUCP has no bearing on this Court's determination of what is required to avoid irreparable harm under the ESA; nor could any SWRCB decision regarding a TUCP preempt Reclamation's duty to comply with the ESA under Section 8 of the Reclamation Act. *See also United States v. Glenn-Colusa Irr. Dist.*, 788 F. Supp. 1126, 1134 (E.D. Cal. 1992) (holding that there is no exemption from the ESA for parties that hold state water rights).

Further, despite State *Amici*'s attempts to misconstrue Plaintiffs' proposed injunction, it in no way interferes with the SWRCB's proceedings or decisions: It does not prohibit or require the SWRCB to take any action regarding the TUCP. Dkt. 321-1. Similarly, Plaintiffs do not ask this Court to review the merits of any decision by the SWRCB. *See* Dkt. 326 at 26–27; Dkt. 344 at 25–26. Plaintiffs simply seek an injunction to require the coordinated operations of the Water Projects to comply with water quality objectives already embedded in the 2019 BiOps, including the Delta inflows, Delta outflow, and Delta Cross Channel gate closure requirements—because such measures are necessary to prevent irreparable harm and ensure compliance with the federal ESA. The Court thus plainly has jurisdiction to grant Plaintiffs' proposed injunction.

---

[5] Intervenors' position is internally contradictory: They ask the Court to deny the motions for equitable relief and uphold the 2019 BiOps, while also urging the Court to ignore Reclamation's modification and violation of those same BiOps through TUCPs. Dkt. 344 at 24–26. Intervenors also ignore the fact that Reclamation has not complied with NEPA before seeking to modify coordinated operations of the CVP and SWP through the TUCP proposed for 2022, even as they argue that Reclamation must comply with NEPA before implementing the IOP. Dkt. 328 at 29.

### C. Plaintiffs' Proposed Modifications to Delta Operations Are Necessary to Avoid Irreparable Harm.

Plaintiffs' proposed injunction would reinstate two critical limits on South of Delta pumping from the 2009 NMFS biological opinion—the San Joaquin River Inflow-to-Export Ratio ("I:E ratio") and restrictions on negative Old and Middle River ("OMR") flows—and would impose a new restriction targeted at preventing the extinction of Delta Smelt. Dkt. 321-1. Plaintiffs have demonstrated that these protections are necessary to prevent irreparable harm to imperiled Delta Smelt and ESA-listed salmonids. Dkt. 322 at 19–22; Supp. Rosenfield Decl. ¶46.

### 1. Additional restrictions on OMR flows are critical to species' survival and recovery.

- **2019 BiOps.** Limits OMR to a maximum negative flow of -5,000 cubic feet per second ("cfs") except "during storm events," in which there is no limit on negative OMR for the duration of the event, unless applicable Delta water quality standards or other BiOp provisions control.

- **Plaintiffs' Proposal.** OMR reverse flows must be maintained within range of -1,250 to -5,000 cfs (on a 14-day running average) from January to June; requires compliance with other limits in 2009 NMFS BiOp RPA Action IV.2.3, including reduction of pumping for short periods after salvage limits are exceeded. Daily OMR flows must be zero or positive for seven consecutive days following salvage of one or more Delta Smelt.

- **IOP.** During January and February, allows for OMR of -6,250 cfs (five-day average) when there is a "measurable precipitation event" and water is available for export. IOP ¶¶6.vi & vii, 7. Otherwise, OMR should be no more negative than -5,000 cfs from January through June.

Federal Defendants do not dispute Dr. Rosenfield's testimony that limiting reverse OMR flows to -5,000 cfs, including during "storm events," is necessary to avoid irreparable harm resulting from entrainment of Delta Smelt and salmonid species at the Projects' South of Delta pumping facilities. Supp. Rosenfield Decl. ¶49. Federal Defendants and Intervenors' assurances that the "storm flex" provision may not be invoked in 2022, Dkt. 326 at 13–14; Dkt. 344 at 16–17, are ultimately beside the point because there is no biological basis for allowing these provisions. Supp. Rosenfield Decl. ¶49 (explaining that there is no biological basis for setting maximum negative flows at -6,250 cfs). After several years of devastating species mortality under the BiOps, it would be unreasonable to simply hope that Federal Defendants' internal working groups and monitoring processes are sufficient checks against the insufficiently protective BiOps. *See also Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 350–57 (E.D. Cal. 2007)

1   (holding that mandatory *process*, which does not ensure that mitigation *actions* are reasonably

2   certain to occur, violates the ESA).

3          Moreover, Federal Defendants admit that the salvage loss triggers under the 2009 BiOps

4   included in Plaintiffs' proposed injunction will be more protective than the IOP at pumping levels

5   of 1,500 cfs, do not dispute that Plaintiffs' injunction would be more protective than the salvage

6   limits in the 2019 BiOps, and admit that the IOP includes no limits on salvage of steelhead (unlike

7   Plaintiffs' proposed injunction). Dkt. 326 at 16; Dkt. 326-3 ¶¶17–18. Federal Defendants oppose

8   Plaintiffs' proposal to include any mandatory OMR restrictions if adult Delta Smelt are salvaged,

9   Dkt. 326 at 15, but their declarant cites modeling demonstrating that reducing negative OMR

10  flows increases the likelihood of positive population growth for Delta Smelt. *See* Dkt. 326-1 ¶11

11  (population likely to continue to decline under the 2019 BiOps, with only 39% chance of

12  population growth, with increased chances of population growth when OMR is less negative).[6]

13  Finally, Plaintiffs' proposed injunction does not seek to eliminate any so-called "proactive" OMR

14  provisions from the 2019 BiOps, nor inter-agency collaboration and monitoring, Dkt. 326 at 16,

15  but rather seeks to supplement those requirements with an OMR limit of -5,000 cfs and loss

16  triggers that will avoid irreparable harm to ESA-listed species.

17              **2.   Reinstating the I:E ratio is necessary to avoid irreparable harm.**

18  • **2019 NMFS BiOp.** Eliminates the I:E ratio previously included in the 2009 NMFS BiOp.

19  • **Plaintiffs' Proposal.** Requires compliance with 2009 NMFS BiOp RPA Action IV.2.1: In
        Critically Dry year, ratio of San Joaquin River inflow to CVP/SWP combined exports will be
20      1:1 on a 14-day average; in a Dry year, the ratio will be 2:1.

21  • **IOP.** Reclamation and DWR will reduce exports in order to provide incidental spring
        outflow. IOP ¶11. Federal Defendants contend this would comply with the 2009 NMFS
22      BiOp's I:E ratio; State *Amici* disagree.

23          This Court previously issued an injunction requiring compliance with the 2009 NMFS

24  BiOp's I:E ratio and recognized that the ratio provides important protections for migrating Central

25  Valley steelhead. Dkt. 173 at 31–32. The evidence shows that implementing the I:E ratio in 2022

26  _____

27  [6] Given that the Delta Smelt population is critically endangered and is predicted to continue
    declining under the 2019 BiOps, Federal Defendants and Intervenors fail to show how entrainment
    of any Delta Smelt is consistent with the ESA. Neither the 2019 FWS BiOp nor the IOP requires
28  any operational changes if adult Delta Smelt are entrained, which occurred on January 16, 2022.
    Supp. Chisholm Decl., Ex. S.

is again necessary to avoid irreparable harm to steelhead and other species. Supp. Rosenfield Decl. ¶¶64–68. Federal Defendants do not dispute this, but contend the IOP is no different from Plaintiffs' proposal. Dkt. 326 at 12. State *Amici* disagree and argue that re-imposing the I:E ratio would conflict with the State's Incidental Take Permit ("ITP"), which the IOP incorporates, but fail to explain why the Court cannot order more protective measures. Dkt. 343-1 at 16.[7]

Intervenors' claims that the recent Buchanan et al. study undermines the need for the I:E ratio are misleading. Dkt. 344 at 14–15. As Dr. Rosenfield explains, this 2021 paper identified a statistically significant correlation between steelhead survival and the I:E ratio, Supp. Rosenfield Decl. ¶66; moreover, although Intervenors maintain that this correlation is largely due to inflows rather than exports in the context of steelhead, they disregard the irreparable harms to other ESA-listed species that will result if the I:E ratio is not implemented. *Id.* ¶¶67–68.[8]

### D. Plaintiffs' Proposed Injunction Is Designed to Avoid Irreparable Harm While Also Being Feasible.

While Federal Defendants and Intervenors argue that certain elements of Plaintiffs' proposed injunction are infeasible, their arguments are based on a mischaracterization of the proposed relief and Reclamation's obligations under the ESA. The proposed injunction is plainly feasible, ensures water supply for human health and safety and refuge water supplies, and is consistent with the Court's authority and Reclamation's obligations under the ESA.

First, Federal Defendants and Intervenors argue that Plaintiffs' proposed injunctive measures regarding Shasta Reservoir storage and downstream water temperatures "may" be

---

[7] State *Amici* make the unconvincing argument that adopting Plaintiffs' proposed injunction would somehow interfere with ongoing state-court litigation. Dkt. 343-1 at 6–7. This is simply not true. State *Amici* refer to a lawsuit in state court that involves exclusively state-law claims that the State's 2020 ITP violates the California Endangered Species Act. The IOP is not the subject of that litigation. And this Court's determination that certain injunctive relief—indeed, injunctive relief it previously ordered—is necessary to comply with the *federal* ESA will not "impinge on" the state court's review of the ITP. Dkt. 343-1 at 23; *see* Dkt. 328 at 15 n.9 (Intervenors' brief recognizing that "[t]he State's ITP for the SWP is not before the Court and would not be vacated, regardless of the Court's decision on this motion"). Perplexingly, State *Amici*'s position to the contrary appears to foreclose consideration of even the IOP, which the State has asked the Court to enter as injunctive relief. Regardless, State *Amici* provide no reason to conclude that this Court should refrain from ruling on a matter of federal law.

[8] Although Federal Defendants' declarant asserts that the I:E ratio's effect on Delta Smelt was not considered by FWS in its 2008 BiOp, Dkt. 326-1 ¶7, that is not the question: Rather, the Court must ask whether the I:E ratio is necessary to avoid irreparable harm to the Delta Smelt *in 2022*. As Dr. Rosenfield explains, it is. Supp. Rosenfield Decl. ¶¶67–68.

infeasible, depending upon hydrology. Dkt. 326 at 19–21; *see* Dkt. 344 at 22–24.[9] However, the proposed injunction explicitly addresses the possibility that Reclamation may not be able to meet its specific storage, temperature, and water quality requirements even after curtailing water allocations and deliveries to CVP and SWP contractors, and therefore the proposed injunction allows Reclamation to seek relief from these requirements. Dkt. 321-1 at 4. Plaintiffs structured the injunction this way because even if Reclamation cannot fully meet these requirements, higher volumes of water storage and cooler water temperatures below Shasta Dam that would result under the proposed injunction would reduce temperature-dependent mortality of winter-run Chinook salmon—and thus reduce irreparable harm, even if they cannot fully eliminate it. Supp. Rosenfield Decl. ¶41; Dkt. 324-4 (2021 NMFS modeling showing that reducing reservoir releases by 500,000 acre-feet in the summer months would have reduced temperature-dependent mortality from 80% to 50% last year). In other words, Plaintiffs' proposed injunction is tailored to reduce the irreparable harms associated with Federal Defendants' ESA violations as much as possible.

As an initial matter, Federal Defendants do not claim that the proposed injunction's end of September storage requirement is infeasible; they focus only on the end of April storage requirements. Dkt. 326 at 19–20. Importantly, Federal Defendants' argument that the water temperature requirements of the proposed injunction are infeasible is based on the assumption that temperature management is primarily based on the volume of the cold-water pool at the end of May. *Id*. at 20. Federal Defendants, however, ignore the fact that limiting releases from Shasta in between April and September—by reducing allocations and water deliveries to CVP and SWP contractors—is essential to conserving the cold-water pool and meeting protective water temperatures when reservoir storage is low, as NMFS has previously concluded. Supp. Rosenfield Decl. ¶¶41–42; Dkt. 324-4; Dkt. 229-24 at 224–27 (NMFS' 2017 Shasta RPA Amendment proposing limits on maximum reservoir releases as "an important and effective strategy to stretch the cold water management season"); *see also CNRA* Dkt. 223 (Grober Decl.) ¶¶33–34, 39, 42–43.

---

[9] Intervenors make the completely unsupported argument that the lack of modeling is "fatal" to Plaintiffs' proposed injunction, citing no case law, regulation, or statutory requirement. Dkt. 344 at 22. There is no such requirement, and courts routinely order injunctive relief without such modeling—including this Court, in *Natural Resources Defense Council v. Kempthorne* (2007).

This omission of the effects of reducing contract allocations after May undercuts the claim that the proposed injunction's water temperature requirements are infeasible.

Intervenors also argue that the proposed injunction is infeasible because Reclamation cannot reduce water deliveries or contract allocations to certain contractors. Dkt. 344 at 18–19; *see* Dkt. 328 at 24–26, 32–33. These arguments misstate Reclamation's legal obligations and prior court rulings. Fundamentally, it is unlawful for Reclamation to operate the CVP, including water deliveries to its contractors, in a manner that jeopardizes species listed under the ESA. 16 U.S.C. §1536(a)(2). Reclamation has no discretion to ignore or violate these statutory obligations. With respect to the Sacramento River Settlement Contractors, this Court has already held that, under the terms of the contracts, if a future consultation under the ESA requires additional protections for Delta Smelt, Reclamation will have to revisit these contracts and modify their terms to comply with the ESA. *NRDC v. Bernhardt*, Case No. 1:05-cv-01207, Dkt. 1314 at 49–50 (E.D. Cal. Feb. 26, 2019). And with respect to the San Joaquin River Exchange Contractors, at a minimum Intervenors admit that Reclamation has discretion to deliver water to these contractors from Friant Dam instead of the Delta, Dkt. 354 ¶12, and they do not dispute that doing so could help achieve the proposed injunction's requirements for Shasta storage and temperatures and Delta water quality objectives.

In contrast to Intervenors, Federal Defendants' "feasibility" arguments regarding the requirement to reduce contractor allocations are only that: (1) reducing contractor allocations may not improve Shasta storage, Dkt. 326 at 20–21; and (2) Reclamation "has no control over water user diversions," *id*. at 24 n.14. Federal Defendants' first argument fails because it ignores the facts that: (a) reducing contractor allocations also improves Reclamation's ability to meet Delta water quality objectives, which is part of Plaintiffs' proposed injunction; and (b) the proposed order requires Reclamation to reduce allocations "as necessary to achieve" the injunction's Shasta and Delta water quality requirements, Dkt. 321-1 at 4. Federal Defendants' second argument concedes that Reclamation *can* reduce allocations based on shortage provisions in the contracts. Dkt. 326 at 24 n.14. To the extent that contractual limitations or diversions by water rights holders (including water diversions by the Sacramento River Settlement Contractors and/or DWR)

nonetheless impair Reclamation's ability to meet minimum ESA requirements in 2022, that

demonstrates the need for the proposed injunction's partial vacatur of the incidental take

statement, at a minimum. *See infra* Part II.E.

Intervenors also take issue with Plaintiffs' reliance on the SWRCB's regulatory definition

of human health and safety. Dkt. 344 at 19–20, 27. Plaintiffs provide an exception to their

proposed injunction's protective measures for diversions necessary for human health and safety:

Such diversions would be permitted even if they conflicted with the minimum protections

necessary to avoid jeopardy and comply with the ESA identified in the injunction. Dkt. 321-1 at

4.[10] Intervenors would expand this exception to swallow the rule, including agricultural and other

profit-making uses of water as "human health and safety" needs. *See* Dkt. 344 at 27; Dkt. 353 ¶21.

Similarly, State *Amici*'s assumption that a minimum Delta pumping level of 1,500 cfs is

necessary to meet human health and safety requirements is incorrect. *See* Dkt. 343-1 at 17; Dkt.

353 ¶21. That pumping level is explicitly designed to deliver water to the San Joaquin River

Exchange Contractors and other water users and far exceeds what is needed for human health and

safety. *See* Dkt. 120-5 (Final Biological Assessment ("Final BA")) at 92 (explaining that 1,500 cfs

minimum pumping rate is designed "to meet health and safety needs, critical refuge supplies, *and*

*obligations to senior water rights holders*" (emphasis added)); Supp. Chisholm Decl., Exh. T at 3

(2014 report by Reclamation and DWR explaining that minimum pumping to meet health and

safety needs is far less than 1,500 cfs, using 55 gallons per capita per day to calculate need).[11]

Moreover, Reclamation and DWR are not planning to limit water supply allocations to

human health and safety in 2022, but instead are currently considering *increasing* water supply

---

[10] Given this express exception for water diversions by the CVP and SWP that are necessary to
meet human health and safety, Dkt. 321-1 at 4, State *Amici*'s arguments that the injunction would
not permit such diversions are without merit, Dkt. 343-1 at 6, 17. The IOP also defines human
health and safety as a subset of municipal and industrial water use, excluding agricultural use and
some municipal and industrial use. Dkt. 313-1 ¶12(i)(a).

[11] Federal Defendants and State *Amici* also claim that Plaintiffs' proposed requirement of zero or
positive OMR for seven days if an adult Delta Smelt is entrained may be infeasible, but their
arguments do not withstand scrutiny. Dkt. 326 at 15; *see* Dkt. 343-1 at 17. Federal Defendants
assert they have no control over DWR's operations, but the injunction would bind DWR to the
extent it acts in concert with Reclamation. *Id.* Federal Defendants also admit that this requirement
could be met if combined Delta pumping is reduced below 1,500 cfs, Dkt. 326-2 ¶5; combined
pumping routinely is reduced below 1,500 cfs in order for the CVP and SWP to meet D-1641
water quality objectives, including in 2021. Supp. Chisholm Decl., Exh. U.

allocations to their contractors, including wholly discretionary allocations.  *See* Supp. Chisholm

Decl., Exh. V (DWR's Jan. 20, 2022 Notice to Contractors increasing the SWP allocation to 15%

(635,434 acre-feet)); *id*., Exh. W (DWR's Jan 6, 2022 allocation modeling, assuming a 50% or

100% allocation to Feather River Settlement Contractors); *id*., Exh. X (notwithstanding the IOP,

Reclamation plans to make allocations to contractors in mid-February).

Finally, Plaintiffs note that even as Intervenors and Federal Defendants claim that certain

elements of Plaintiffs' proposed injunction are infeasible, they fail to discuss how water supply

allocations by Reclamation and DWR to their contractors make compliance with even the

woefully inadequate 2019 BiOps infeasible, leading to Reclamation's proposal to violate Delta

water quality objectives required under the BiOps and the likely violation of the incidental take

statement for winter-run Chinook salmon below Shasta Dam in 2022.

### E.  Vacating the Incidental Take Statement in Part Is Necessary and Appropriate to Comply with the ESA.

Whereas Federal Defendants and State *Amici* would leave the 2019 BiOps' incidental take

statement in place, Plaintiffs propose to reform it to comport with the terms of the injunction.  Dkt.

321-1.  Most basically, this partial vacatur of the incidental take statement is necessary to comply

with the ESA's prohibition on incidental take that jeopardizes the continued existence and

recovery of listed species.  *See* 16 U.S.C. §§1538(a)(1)(B), 1539(a)(2)(B)(iv); *Nat. Res. Def.*

*Council v. Kempthorne*, No. 1:05-CV-01207 OWW GSA, 2007 WL 4462395, at *21 (E.D. Cal.

Dec. 14, 2007).  Although no party disputes that this Court possesses the authority to vacate the

incidental take statement—which it certainly does, *see Klamath-Siskiyou Wildlands Ctr. v. Nat'l*

*Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1249 (N.D. Cal. 2015)—Federal

Defendants protest that such relief is "unnecessary," Dkt. 326 at 28–29.  This argument is

disingenuous and incorrect.

The Court should not leave in place an incidental take statement that is "broader than the

project" as modified and "allows for the take of more [members of the listed species] than are

affected by the remaining portions of the BiOp" once the Court vacates the BiOps in part and

orders additional protective measures.  *See Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1037

(9th Cir. 2007). Although Federal Defendants maintain that they cannot be liable for unlawful take based on measures implemented pursuant to an order granting injunctive relief, they fail to recognize that the BiOps' incidental take statements cover actions by entities other than Federal Defendants. It is necessary, and appropriate, to vacate the incidental take statement to the extent it is inconsistent with court-ordered equitable relief so that non-parties[12] and contractors are not shielded from ESA liability if 2022 Water Project operations exceed the terms of the injunction.

**III.  The Equities and Public Interest Strongly Weigh in Favor of Plaintiffs' Injunction.**

The equities and public interest strongly weigh in favor of granting Plaintiffs' proposed injunction, and the arguments to the contrary lack merit. Where there is irreparable harm to listed species, courts presume that these factors will support issuance of an injunction under the ESA. *Nat'l Wildlife Fed'n*, 886 F.3d at 817–18. Here, Federal Defendants and State *Amici* admit that interim equitable relief is appropriate, but argue that the public interest does not support Plaintiffs' proposed injunction because the IOP would "ensure listed species are protected" and balance other competing uses of water.[13] Dkt. 326 at 25–26; *see* Dkt. 343-1 at 21. Yet neither Federal Defendants nor State *Amici* have alleged, let alone demonstrated with evidence, that the IOP is sufficient to avoid jeopardizing listed species; the wholly conclusory statements in their briefs are

---

[12] Contrary to the suggestion by State *Amici* and Intervenors that this Court may not "enforce the ESA against the Nonparty State Agencies," including DWR, *see* Dkt. 343-1 at 20 n.14; Dkt. 344 at 18 n.16, the Court certainly has jurisdiction to order injunctive relief that is binding on nonparties "acting in concert" with Federal Defendants. *See* Fed. R. Civ. P. 65(d)(2)(C); *Nat. Res. Def. Council v. Kempthorne*, 539 F. Supp. 2d 1155, 1166 (E.D. Cal. 2008). As all the parties acknowledge, CVP and SWP operations are closely coordinated and have been for decades, sufficient to invoke Rule 65. Dkt. 314 at 9, 11–12 (Federal Defendants' motion for voluntary remand and interim relief that would "align" federal and state operations); Dkt. 328 at 20 (Intervenors' opposition noting the Coordinated Operations Agreement ("COA") between the federal and state governments); *see also CNRA* Dkt. 220 at 9 (State's motion for adoption of the IOP); Dkt. 120-5 at 38 (final October 2019 Biological Assessment describing "coordinated long-term operation of the CVP and SWP"). In addition, as State *Amici* concede, the California Natural Resources Agency, the parent agency of DWR, has waived sovereign immunity by filing suit. Dkt. 343-1 at 20 & n.13. Further, there is no requirement that Plaintiffs serve DWR or the water contractors with a separate 60-day notice letter regarding their ESA claims, which Plaintiffs brought against Federal Defendants and not DWR or the Intervenors, *see Kempthorne*, 539 F. Supp. 2d at 1165. In any event, the 60-day notice requirement for citizen suits under the ESA does not apply to APA claims seeking invalidation of arbitrary and capricious agency action—including the incidental take statements here. *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124–25 (9th Cir. 1997).

[13] As discussed, the Court owes no deference to Federal Defendants' assertions regarding which plan best protects the public interest. *See supra* Part I; *Sierra Forest Legacy*, 646 F.3d at 1185–86.

1    not supported.  *See, e.g.*, Dkt. 320 at 20, 23–27; Supp. Rosenfield Decl. ¶9; Dkt. 328 at 19.

2           Intervenors offer numerous declarations alleging economic harm, but the ESA forecloses

3    this Court's consideration of those allegations and the Court should grant the concurrently filed

4    motion to strike those declarations and arguments.  *See Nat'l Wildlife Fed'n v. Nat'l Marine Fish.*

5    *Serv.*, 422 F.3d 782, 794 (9th Cir. 2005) (upholding district court's refusal to consider evidence of

6    economic harm).  State *Amici* make a related argument that the greater public good can justify

7    denial of an injunction to protect the environment, but the case they cite arose under NEPA, not

8    the ESA, and is thus not on point.  Dkt. 343-1 at 21 (*citing Earth Island Inst. v. Carlton*, 626 F.3d

9    462, 475 (9th Cir. 2010)).  Moreover, as discussed *supra* in Part II.D, Plaintiffs' proposed

10   injunction appropriately protects water supplies necessary for human health and safety.

11          Finally, Intervenors' claims that the Court should deny Plaintiffs' motion because of other

12   purportedly countervailing environmental harms misses the mark.  *See* Dkt. 344 at 26–28.  First,

13   the case Intervenors cite arises under NEPA, not the ESA.  *Id.* at 26 (citing *Idaho Rivers United v.*

14   *U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1266–67 (W.D. Wash. 2015)).  Moreover,

15   while Intervenors claim Plaintiffs' proposed injunction "may" have collateral effects on migratory

16   birds, Dkt. 344 at 26, they do not allege, let alone demonstrate, that these effects would violate the

17   ESA.  With respect to potential effects on steelhead in the American River, Intervenors provide no

18   evidence to support their conclusory statements, *see id*.; rather, they concede that implementation

19   of the 2019 BiOps violated the incidental take statement for steelhead in the American River in

20   2021, and fail to demonstrate that any impact in 2022 would be the result of Plaintiffs' proposed

21   injunction.  Dkt. 328 at 22–23.  And finally, Intervenors are wrong to suggest that the San Joaquin

22   River Restoration Settlement Act (which approved a settlement in which NRDC was the lead

23   plaintiff) tips the balance of equities here:  The Act explicitly does not modify the ESA, requires

24   implementation of the settlement to comply with state and federal environmental laws, and does

25   not affect Reclamation's obligations under the San Joaquin River Exchange Contract.  *See* Pub. L.

26   No. 111-11, 123 Stat. 991 (2009), §§10004(j), 10006(a), 10011(c)(4); *see also* Dkt. 354 ¶12.

27

28

## IV. Plaintiffs Are Likely to Succeed on the Merits of Their ESA and APA Claims.

Plaintiffs have established that they are likely to succeed on the merits of their claims. Plaintiffs' opening brief and prior motion for a preliminary injunction detailed the numerous reasons that the 2019 BiOps, and Reclamation's reliance on them, are arbitrary, capricious, and unlawful. Dkt. 322 at 13–18; *see also* Dkt. 86; Dkt. 153. State *Amici* agree, Dkt. 343-1 at 14, and Federal Defendants "do not intend to defend the[] [BiOps] on the merits" and have admitted that equitable relief is appropriate, Dkt. 326 at 5.

Only Intervenors continue to insist that the 2019 BiOps were lawful, but they fail to address many of the BiOps' fatal flaws identified by Plaintiffs and their remaining arguments miss the mark. First, Plaintiffs have explained how the no-jeopardy conclusions in the 2019 NMFS and FWS BiOps are arbitrary and capricious, including because they are not rationally connected to the BiOps' analysis showing increased harm to ESA-listed species. Dkt. 322 at 14–16; Dkt. 86 at 18–22, 27–30. While Intervenors criticize Plaintiffs' arguments regarding NMFS' July 1, 2019 jeopardy BiOp,[14] and attempt to defend the 2019 NMFS BiOp's elimination of the I:E ratio, overall, they fail to rebut Plaintiffs' showing that the no-jeopardy conclusions are unreasonable.[15]

Second, Plaintiffs have demonstrated that the incidental take statements in both BiOps are arbitrary and capricious: The NMFS BiOp contains inadequate loss triggers that allow three years of total mortality of winter-run salmon, higher take of steelhead, and improper use of surrogates;

---

[14] Intervenors insist that the no-jeopardy NMFS BiOp was "not the result of political influence" but an "iterative and collaborative process." Dkt. 344 at 31. They attempt to discount agency staff memoranda detailing concerns with scientific integrity and political interference on the basis that the memoranda relate to the July 2019 jeopardy BiOp, *id.* at 32, but the memoranda reflect serious problems with the entire consultation process.

[15] Intervenors argue that the 2019 NMFS BiOp's weakening of the I:E ratio was not arbitrary because a recent study (Buchanan et al. 2021) undermines the need for the protective measure. Dkt. 344 at 32–33. But obviously a 2021 paper could not possibly be a justification for eliminating the I:E ratio *in 2019*. Supp. Rosenfield Decl. ¶66; *see Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907–08 (2020) (review of agency action is based on "reasoning *at the time of the agency action*") (internal quotation marks and citation omitted). Intervenors also mistakenly argue that Plaintiffs "apply an incorrect jeopardy standard" by comparing the 2019 BiOps to the prior 2008/2009 BiOps. Dkt. 344 at 29–30. Plaintiffs do no such thing; rather, they point out that the 2019 BiOps compared their effects with effects under the 2008/2009 BiOps to reach their no-jeopardy conclusion, which is unlawful. Dkt. 86 at 21–22, 28 n.14. The operations analyzed in the 2019 BiOps are not insufficiently protective because they are different from actions required under the 2008/2009 BiOps; they are insufficient because they fail to adequately protect listed species that were declining under the prior BiOps. Dkt. 85-3.

the FWS BiOp eliminates numerical limits on adult Delta Smelt killed at pumps and defers its

decision on limits for juveniles. Dkt. 322 at 16–17. Intervenors generally recycle their prior

arguments about the incidental take statements, only deviating to take issue with Plaintiffs'

contention that the NMFS incidental take statement fails to analyze the effects of full contract

deliveries to the Sacramento River Settlement Contractors. Dkt. 344 at 32. But the incidental take

statement authorizes full contract amounts over the term of the contracts, NMFS BiOp at 798–99,

even though the consultation was clearly limited to analysis of historical contract deliveries (not

full amounts) through 2030, Dkt. 120-5 at 38, 48 (Final BA at 4-1, 4-11 n.1), and Intervenors'

citation to a decision involving the 2008 FWS BiOp is inapposite. *Id.* (citing *Nat. Res. Def.*

*Council v. Bernhardt*, No. 1:05-cv-01207 LJO-EPG, 2019 WL 937872, at *16 (E.D. Cal. Feb. 26,

2019)).

Third, Plaintiffs have shown that the BiOps arbitrarily and unlawfully rely on uncertain

mitigation measures, including assuming that Reclamation would meet the minimum water quality

objectives set forth in D-1641 during droughts despite the fact that the agencies had previously

sought waiver of these requirements through TUCPs. Dkt. 322 at 18; Dkt. 86 at 22-24, 30.

Intervenors do not address this basis for the BiOps' invalidity.

These fundamental flaws in the 2019 BiOps demonstrate that they are unlawful under the

APA, and Plaintiffs are likely to succeed on the merits of their claims.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion

for a preliminary injunction.

Respectfully submitted,

Dated: January 24, 2022            */s/ Barbara J. Chisholm*

HAMILTON CANDEE (Cal. SBN 111376)
BARBARA JANE CHISHOLM (Cal. SBN 224656)
NICOLE COLLINS (Cal. SBN 338506)
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151

Facsimile: (415) 362-8064

*Attorneys for Plaintiffs Golden State Salmon Association, Natural Resources Defense Council, Inc., Defenders of Wildlife, and Bay.Org d/b/a The Bay Institute*

Dated:  January 24, 2022                    /s/  Glen H. Spain

GLEN H. SPAIN (Cal. SBN 88097)
P.O. Box 11170
Eugene, OR 97440-3370
Telephone: (541) 689-2000

*Attorney for Plaintiffs Pacific Coast Federation of Fishermen's Associations and Institute for Fisheries Resources*

PROOF OF SERVICE

CASE:     *Pacific Coast Federation of Fishermen's Associations, et al. v. Raimondo, et al.*

CASE NO:     U.S. Dist. Ct., E.D. Cal., Case No. 1:20-cv-00431-DAD-EPG

I am employed in the City and County of San Francisco, California. I am over the age of eighteen years and not a party to the within action; my business address is 177 Post Street, Suite 300, San Francisco, California 94108. I hereby certify that on January 24, 2022, I electronically filed the following with the Clerk of the Court for the United States District Court for the Eastern District by using the CM/ECF system:

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION FOR 2022**

All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 24th day of January, 2022, at Berkeley, California.

*/s/ Barbara J. Chisholm*
Barbara J. Chisholm